529 S.E.2d 620 (2000)
242 Ga. App. 564
In the Interest of T.B., a child (Two Cases).
Nos. A99A2086, A99A2087.
Court of Appeals of Georgia.
February 4, 2000.
Reconsideration Denied March 2, 2000.
*621 James E. Wilbanks, Dalton, for appellant (case no. A99A2086).
Michael R. McCarthy, Dalton, for appellant (case no. A99A2087).
Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen A. Sgrosso, Assistant Attorney General, Waycaster, Morris, Johnson & Dean, Cynthia N. Johnson, Dalton, for appellee.
*622 MILLER, Judge.
This is a tale of two parents: a 16-year-old mother whose parental rights the court terminated because she dropped out of high school and a 21-year-old father whose parental rights the court terminated because he was late in meeting some of the goals of his reunification plan. While it is important to receive an education, failure to complete school cannot be the primary reason to terminate parental rights, and thus we reverse the termination of the mother's rights (Case No. A99A2086). Nor are delays in meeting some goals of a court-ordered reunification plan alone sufficient, and thus we also reverse the termination of the father's rights (Case No. A99A2087).
Thirteen-year-old Samantha Elder and nineteen-year-old Michael Blassingame conceived a boy, T.B. Because of Elder's truancy from school, the Department of Family & Children Services took custody of Elder prior to T.B.'s birth. DFACS also took custody of T.B. upon his birth and placed both T.B. and now 14-year-old Elder in the same foster home, so she could help care for him.
DFACS developed a case plan to reunify Elder and T.B., which Elder generally followed until DFACS about a year later took T.B. from Elder's care and placed him in a distant foster home. Distraught about the absence of her child, Elder nevertheless followed the case plan with the exception that she married a man and dropped out of high school to get a job in an effort to establish a stable residence for the hoped-for return of her child. In response, DFACS petitioned to have her parental rights terminated for her failure to meet the case plan goal of attending school.
Meanwhile, despite repeated demands from DFACS, Blassingame delayed petitioning to legitimate T.B. for about a year until T.B. was placed in the distant foster home. Once this petition was filed, DFACS developed a case plan (to run for six months) to reunify Blassingame with T.B., the goals of which Blassingame for the most part met, although with some delay. He was delinquent in paying child support but then caught up; he procured somewhat stable employment; he worked on creating a stable home; and he completed parenting classes late in the six-month period.
Following a hearing, the juvenile court terminated the rights of both parents. Both appealed, citing premature filing and insufficiency of the evidence.
1. Arguing that DFACS had prematurely filed the petition to terminate, both Elder and Blassingame contend that T.B. had not yet been in foster care for the 15 months specified in OCGA § 15-11-41(n). But OCGA § 15-11-41(n) does not require that 15 months of foster care transpire before DFACS may file a petition; rather, it simply provides that after 15 months of foster care (of the most recent 22 months), DFACS shall file a petition to terminate, with certain exceptions. Regardless of whether T.B. met the 15-month definition, the statute did not preclude an earlier filing; it simply directed a filing if the definition was met. This enumeration is without merit.
2. We recently reiterated that "[a]s there is no judicial determination that has more drastic significance than the permanent severance of a natural parent-child relationship, the severance of that relationship must be exercised cautiously and scrutinized deliberately. [Cit.]"[1] Moreover, in In the Interest of C.G.,[2] we emphasized that "[b]ecause the termination of parental rights has a final, ultimate, and significant result, that judgment must conclusively show compliance with the statutory criteria prescribed as a condition precedent."[3] Thus, no court can terminate a parent's rights to his or her child unless there is clear and convincing evidence of present parental unfitness and of the termination being in the best interest of the child.[4]
*623 OCGA § 15-11-81(b)(4)(A)(i)-(iv) prescribe that a court can find parental unfitness only if it finds all four of the following facts by clear and convincing evidence: (i) the child is deprived, (ii) lack of parental care caused the deprivation, (iii) such is likely to continue, and (iv) continued deprivation is likely to cause serious harm to the child.[5] In reviewing the evidence, we construe it in favor of the juvenile court's findings.[6]
3. We review these factors first relative to Elder.
(a) Deprivation. The juvenile court had previously determined that T.B. was and continued to be deprived and entered deprivation and extension orders to that effect. Because Elder did not appeal any of these orders, for purposes of the termination hearing she was bound by this finding of deprivation.[7]
(b) Lack of Proper Parental Care and Control. To determine whether the child is without proper parental care and control, the court considers, among other things, the physical, mental, or emotional deficiencies of the parent; excessive use of alcohol or drugs; felony convictions and imprisonment; egregious conduct toward the child or other children; neglect of the child; and abuse of siblings.[8] DFACS does not allege that any of these factors were present here.
Where the child is not in the custody of the parent, the court also considers, among other things, whether the parent, for a period of one year or longer, failed significantly (i) to maintain a meaningful parental bond with the child, (ii) to pay required child support, or (iii) to comply with the reunification plan.[9] DFACS does not contest Elder's compliance with the first two, but rather places all its eggs in one basket: noncompliance with the reunification plan. As stated in its appellate brief, "[t]he Department simply decided to proceed with termination in the case at bar for one simple reasonAppellant failed to comply with her court-ordered reunification case plan which had been in effect for over one year."
That reunification plan had five goals for Elder: (i) obtain parenting skills; (ii) learn to manage her behavior; (iii) maintain meaningful contact with T.B.; (iv) cooperate with DFACS; and (v) stay in school and make progress toward a high school diploma. As the following demonstrates, and as conceded by the DFACS representative at trial, the only goal she did not achieve was the educational goal.
(i) Obtaining parenting skills. The DFACS caseworker admitted that Elder attended three sets of parenting classes at the maternity home, at school, and at summer camp. She did very well in the school class, receiving grades of 93 and 100 (although she eventually stopped the class when she dropped out of school), exhibited a working knowledge of parenting techniques, and did so well at the summer camp that she was recommended to the advisory board. The caseworker conceded that through these classes Elder had acquired and applied parenting skills, although she was not consistent in her applications. Regarding examples of inconsistency, Elder once threw a toy at the child to get him to stop doing something and either she or her sister once "kind of" hit him on the head with a pot as a playing technique. She was also "verbally aggressive" with some children in a sample class. These isolated vague instances do not support clear and convincing evidence of parental unfitness.
(ii) Learning to manage behavior. Elder successfully completed an eight-week anger management course and received and cooperated in professional counseling about her behavior. The caseworker testified that although unsettled early on, since her marriage Elder had made improvements in managing her behavior. The anger counselor testified that she stood out as one of the positive leaders of the anger management *624 group. Although she still needed some counseling, she had progressed and had become a nurturing mother in need simply of continued direction and guidance.
(iii) Maintaining meaningful contact with T.B. The caseworker readily admitted that Elder had maintained meaningful contact with T.B. and had not missed a visit. In fact, during the first year of T.B.'s life, even though he was in the custody of DFACS, Elder had lived with and cared for the child. Only after the decision to place T.B. in a distant foster home did that care end, which severely traumatized 15-year-old Elder. She pleaded for more visitation than the DFACS-supervised one hour a week, but to no avail.
4. Cooperating with DFACS. The caseworker conceded that Elder cooperated with DFACS. As a rule she followed through on DFACS' requests. She consistently came in when asked, attended all reviews, and took requested drug screens.
5. Attending school. The only goal not achieved by Elder was attending school. Although during the first year she made progress in school attendance (except for absences due to gall bladder surgery and doctor appointments), during the second year Elder began missing more and more school. This absenteeism also violated the terms of her probation for truancy and unruly behavior. After T.B. was placed in a distant foster home, her attendance plummeted; she was suspended for fighting; she spoke aggressively to a teacher (and was required to wait for security to escort her away); and she began failing three of her four courses. She eventually dropped out of school to marry and get a job in the hope of establishing a home for T.B.
Because the caseworker felt attending school was "essential" to being a good parent and was the "biggest requirement" of the case plan, DFACS sought to terminate her parental rights on this ground.[10] Significantly, her problems with keeping terms of probation (staying out past curfew and contacting child's father) dissipated once she married, and she completed the terms of her probation with the exception of school attendance. Her probation was closed the month of the hearing.
Where the primary allegation of parental misconduct is failure to comply with a case reunification plan, and where the evidence is undisputed that the parent has complied with four of the plan's five goals, where the only unmet goal is completing high school, and where the parent quit high school to marry and get a job to provide a home for the child, there is by no means clear and convincing evidence of parental misconduct under OCGA § 15-11-81. The other bases enumerated in the court order, which are not defended by DFACS on appeal, also do not withstand scrutiny. The facts that she had known her husband only four to five months before marriage, that he had lost a child to DFACS because he could not afford the child, and that he had held employment only for weeks prior to the hearing are hardly relevant to her parenting skills. Similarly irrelevant are her decision to stop taking depression medication once she felt better and her inability to work until she quit school.
We need not address the other factors of OCGA § 15-11-81(b)(4)(A)(iii) and (iv) other than to say that they cannot be proven absent a showing of parental misconduct.[11] "While we are reluctant to reverse the juvenile court's determination, no judicial determination is more drastic than the permanent severing of the parent-child relationship."[12] In light of the undisputed evidence, we reverse the judgment terminating Elder's parental rights and remand the case for the establishment of a new reunification plan, subject to whatever disposition is warranted *625 by future events and those occurring since the termination hearing.[13]
6. The father, Blassingame, has a similar story. True, he delayed a year, despite repeated requests from DFACS, before petitioning to legitimate T.B. But once he received a case plan, the evidence is undisputed that during the six months of the plan he substantially met or worked toward the plan's goals. Because his failure to meet these goals timely was the primary basis for terminating his rights, we reverse. We discuss the criteria of OCGA § 15-11-81(b)(4)(A) seriatim.
(a) Deprivation. Like Elder, Blassingame failed to appeal the orders finding deprivation and is therefore bound by same.[14]
(b) Lack of proper parental care and control. As with Elder, DFACS pointed to none of the factors of OCGA § 15-11-81(b)(4)(B) as a basis for termination. His single arrest for marijuana possession and the positive test of marijuana in his urine do not constitute clear and convincing evidence of an excessive use or history of chronic unrehabilitated abuse of narcotics under OCGA § 15-11-81(b)(4)(B)(ii), particularly where DFACS presented no evidence that such rendered him incapable of providing adequately for the needs of T.B. The caseworker conceded that Blassingame regularly visited T.B. and that he had caught up on his child support, so the only factor under OCGA § 15-11-81(b)(4)(C) to justify termination was his alleged failure to comply with his reunification plan.
His plan had six goals to be achieved within six months: (i) address mental health and anger issues by completing a parenting assessment and parenting classes, (ii) create a stable living environment, (iii) keep a job for six months, (iv) pay child support, (v) have regular visits with T.B., and (vi) cooperate with DFACS. The undisputed evidence shows that he achieved or was well on his way to achieving most of these goals, although he was late in doing so.
(i) Addressing mental health issues. Blassingame completed the parenting assessment as requested. He also attended counseling as requested. He attended and completed an entire sequence of parenting classes and received a certificate during the latter part of the six-month period.
(ii) Create a stable living environment. Blassingame established a home for T.B., which DFACS found to be "fairly neat and clean." The grandfather also lived there and had a drinking problem, which Blassingame felt was undesirable. DFACS presented no evidence that the home was only temporary or was unsafe. Nor did DFACS feel that a home separate from the grandfather was required.
(iii) Keep a job for six months. Halfway through the six months of the case plan, Blassingame obtained employment that he held for the three and one-half months preceding the termination hearing. DFACS presented no evidence that he was soon to be fired from this job. Thus, Blassingame was complying with this goal of the case plan at the time of the hearing.
(iv) Pay child support. Blassingame fell behind in child support, which he caught up after the panel review of his case. This was still within the six-month period of the plan. He was current at the time of the hearing.
(v) Have regular visits with T.B. As with Elder, the caseworker readily admitted that Blassingame had regular visits with T.B. Blassingame continuously asked for more visits, which led to friction between him and DFACS.
(vi) Cooperate with DFACS. As requested, Blassingame attended all panel reviews regarding T.B. After initially refusing, he submitted to a urine drug screen, which tested positive for marijuana. His primary confrontation with DFACS was his demand for more visits with T.B.
Blassingame is far from being a model citizen, but the above does not establish by clear and convincing evidence that he engaged in misconduct that caused T.B. to be *626 deprived or that such misconduct was likely to continue. Case plans are significant factors, but delayed compliance with a minority of a plan's goals cannot alone serve as the sole basis for terminating parental rights. We reverse the judgment terminating Blassingame's parental rights and remand the case for the establishment of a new reunification plan, subject to whatever disposition is warranted by future events and those occurring since the last termination hearing.[15]
Judgments reversed.
POPE, P.J., concurs.
BLACKBURN, P.J., RUFFIN and ELLINGTON, JJ., concur in the judgment only.
ANDREWS, P.J., and SMITH, J., dissent.
SMITH, Judge, dissenting.
I respectfully dissent. The mother's rights were not terminated simply "because she dropped out of high school," as the majority asserts. Substantial evidence was presented that the mother has serious unresolved problems, including unstable and violent behavior, refusal to take prescribed psychoactive medication, and continuing probation violations, even under the threat of pending termination of her rights. On appeal from a termination of parental rights, "this court neither weighs the evidence nor determines the credibility of witnesses; rather, we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met." (Citation and punctuation omitted.) In the Interest of W.M., 239 Ga.App. 319, 321(1), 521 S.E.2d 230 (1999). We should not reweigh the evidence and substitute our judgment on the cold record for that of the judge who saw and heard the witnesses and evaluated their testimony in person.
I am authorized to state that Presiding Judge ANDREWS joins in this dissent.
NOTES
[1] In the Interest of K.M., 240 Ga.App. 677, 679-680, 523 S.E.2d 640 (1999).
[2] 235 Ga.App. 23, 508 S.E.2d 246 (1998).
[3] (Citation and punctuation omitted.) Id. at 24, 508 S.E.2d 246.
[4] K.M., supra, 240 Ga.App. at 679-680, 523 S.E.2d 640; see OCGA § 15-11-81(a).
[5] See In the Interest of K.D.S., 237 Ga.App. 865(1), 517 S.E.2d 102 (1999).
[6] Id.
[7] Id. at 865(1)(a), 517 S.E.2d 102.
[8] OCGA § 15-11-81(b)(4)(B)(i)-(vi).
[9] OCGA § 15-11-81(b)(4)(C)(i)-(iii).
[10] Cf. C.G., supra, 235 Ga.App. at 24, 508 S.E.2d 246 (the crux of the DFACS case was the mother's mental condition, which no evidence showed was likely to continue).
[11] Moreover, regarding the child's best interest, we note the uncontradicted testimony that T.B. responded well to Elder and was upset when removed from her presence.
[12] K.M., supra, 240 Ga.App. at 680-681, 523 S.E.2d 640.
[13] Id. at 681, 523 S.E.2d 640
[14] K.D.S., supra, 237 Ga.App. at 865(1)(a), 517 S.E.2d 102.
[15] See K.M., supra, 240 Ga.App. at 681, 523 S.E.2d 640.