A01A1422, A01A1423. IN THE INTEREST OF A. A. et al., children (two cases).
(555 SE2d 827)

POPE, Presiding Judge.

In separate appeals, the mother and father of A. A. and C. O. A. appeal the termination of their parental rights to two of their children. Their cases will be consolidated for consideration on appeal. A. A. was born on January 2, 1997, and C. O. A. was born on February 2, 1998.

1. As an initial matter, both parents contend the trial court improperly considered hearsay evidence. The State's principal witness was Catherine Riggle, a caseworker assigned to the case one

---

week prior to the hearing. According to the State, Lisa Futch, the prior caseworker who had been assigned to the case for 22 months, had recently been terminated. The State did not call Futch to testify nor introduce her case file. Instead, Riggle reviewed Futch's case file and prepared a 13- or 14-page summary. During the hearing, when Riggle began reading the summary, the parents objected on the grounds that it contained "hearsay, conclusions, [and] opinions," and on the ground that it was not a business record. The court overruled the objection. In its final order terminating the parents' rights, the court relied on a significant amount of information contained in the summary of Futch's case file.

Introduction of this testimony was error because the summary was hearsay. "Hearsay evidence is that which does not derive its value solely from the credit of the witness but rests mainly on the veracity and competency of other persons." OCGA § 24-3-1 (a). The summary purported to represent the contents of the file, which purported to represent the opinions and observations of Futch and earlier caseworkers. Thus, the value of the evidence did not rest mainly on Riggle's veracity. See *E. H. Crump Co. &c. v. Millar*, 200 Ga. App. 598, 601 (3) (409 SE2d 235) (1991) (summaries of business records specifically created for use in litigation are not admissible business records); *Foster v. Nat. Ideal Co.*, 119 Ga. App. 773, 775 (3) (168 SE2d 872) (1969) (testimony summarizing business records that were not introduced is inadmissible). Accordingly, the inadmissible evidence cannot constitute clear and convincing evidence of present unfitness in a termination hearing. See *In the Interest of M. L. P.*, 231 Ga. App. 223, 224-225 (498 SE2d 786) (1998) (inadmissible findings of citizens review panel which contained hearsay are not clear and convincing evidence of present parental unfitness). Compare *In the Interest of A. T. H.*, 248 Ga. App. 570, 573-574 (2) (547 SE2d 299) (2001) (records of citizens review panel meetings admissible under OCGA § 15-11-56 (c)).

> However, the Georgia Supreme Court has held that a trial court's consideration of hearsay contained in such records will not constitute reversible error where "the evidence introduced at the hearing, not considering the report, was sufficient to support the findings and conclusions of the juvenile court judge." *In the Interest of M. A. C.*, 244 Ga. 645, 655 (261 SE2d 590) (1979).

*In the Interest of J. T. S.*, 185 Ga. App. 772, 774 (2) (365 SE2d 550) (1988).

2. That brings us to the question of the sufficiency of the evidence. On appeal, we must determine

> whether, after reviewing the evidence in the light most favorable to the appellee, any rational trier of fact could have found by clear and convincing evidence that the natural parent's right to custody should be terminated. On appeal, this Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's factfinding and affirm unless the appellate standard is not met.

(Citations and punctuation omitted.) *In the Interest of C. L. R.*, 232 Ga. App. 134 (1) (501 SE2d 296) (1998).

Excluding the testimony of Riggle from the summary of Futch's case file, the evidence shows the following:

In August 1998, the children were found living in the most deplorable of conditions. The home contained leftover food, trash all over the floor, roaches, the smell of urine, dirty clothes everywhere, and even maggots in the kitchen sink. The children had insect bites, were very dirty, and had soiled diapers that had not been changed. Further, the couple had moved six times in eight months and had again been evicted. In response to these conditions, the children were placed in foster care with Futch assigned as the caseworker.

Another Department of Family & Children Services (DFCS) worker, assigned to monitoring T., an older sibling to the children, testified. Although she offered some testimony regarding the family, very little of the testimony reflected on how A. A. and C. O. A. were being treated. And the only such information offered was in the form of allegations that had not been confirmed or substantiated. She also testified that T., who still lives with the parents, was not up to date on recommended immunizations and that he had missed three scheduled appointments with the pediatrician in June 1998, July 1998, and March 2000.

Riggle testified that she had only one home visit with the parents and that occurred on the Monday prior to the hearing. On her one visit with the family, the house was clean, the power was on, there was enough living space for the family, including places to sleep. The children played, the parents hugged them, and Riggle saw no signs of abuse. The most recent case plan for the children had been issued on January 28, 2000. It provided that the parents must (1) maintain stable, clean, and comfortable housing with all utilities for three months; (2) pay child support; (3) maintain contact with their children; (4) cooperate with the agency; and (5) provide a permanent home for the children. Riggle had no admissible evidence

that these goals had not been met during that period or at any time thereafter prior to the hearing. Riggle explained that the decision to seek termination had been made approximately one year before the hearing based on the facts available at the time. But she conceded that in the most recent six months, the parents had complied with everything the Department required, except for some of their support payments. Indeed, Riggle testified, "There has been compliance with [this most recent case plan], yes."

Fredenal Millsap, a child support worker in the State child support office, also testified. He testified that the parents had voluntarily paid very little of the required support payments. At the time of the hearing, the mother owed $2,144.34 out of $3,052.80 assessed since December 1998. Millsap has twice filed for contempt, but each time, the mother registers for welfare to avoid the contempt action. The father owed only $804.04, but his employer had essentially bailed him out of jail by paying $2,200 of his child support debt after the father had been jailed for contempt.

The parents' landlord testified that the parents were sometimes slow to pay their rent and that he has had to threaten dispossession, but eventually, they always paid. He also testified that the parents always kept the outside of the property clean and that on the four or five occasions that he went inside the home, the inside was clean as well. He never observed anything abnormal about the family.

The deposition of Dr. Wallace Kennedy was admitted into evidence. Kennedy, a psychologist, testified that he saw the parents twice, in October 1998 and October 1999, and the children once, in October 1999. He evaluated the parents to determine whether they had a treatable mental disorder that prevented them from being fit parents.

Kennedy found that the father is illiterate but that he understands math sufficiently to maintain a household and to administer medications properly. He has an IQ of 70, which Kennedy classified as almost retarded or somewhat limited. The father is extremely dependent and immature. Although Kennedy found no treatable mental disorder, he concluded that the father is "absolutely clueless with regard to parenting; how much kids eat, what do they eat, [and] what happens if you don't change diapers," although he could learn these things. The father's condition did not change from 1998 to 1999.

On the other hand, he found the mother to be "bright and capable, competent." He concluded that "there is not a flicker of doubt that she could parent these two children even though these are somewhat difficult children." She has no treatable mental disorder, although she has a character disorder in that she is self-absorbed and believes that she is entitled to things.

Kennedy testified that each child was difficult to manage. But he thought the parents should have one more chance, for six months, to show that they could care for the children. If they failed, he would recommend termination. The plan should include "increased visitation, longer periods of trial parenting, intrusive visits into the home to make sure that it is going okay." Further, the children should have medical supervision and periodic psychological assessment. They were in danger of developing "impermanency syndrome."

Although it appears that the parents have had marital problems, we find nothing in the record to indicate that the two were not married and living together at the time of the hearing.

OCGA § 15-11-94 (formerly § 15-11-81) establishes a two-step process for considering parental rights cases. The court is first required to determine whether there is clear and convincing evidence of parental misconduct or inability. If there is, the court considers whether termination of parental rights is in the best interest of the child.

Under the first step of the test,

[a] finding of unfitness must center on the parent alone, that is, can the parent provide for the child sufficiently so that the government is not forced to step in and separate the child from the parent. A court is not allowed to terminate a parent's natural right because it has determined that the child might have better financial, educational, or even moral advantages elsewhere. [Cit.] Only under compelling circumstances found to exist by clear and convincing proof may a court sever the parent-child custodial relationship.

*Carvalho v. Lewis*, 247 Ga. 94, 95 (274 SE2d 471) (1981). Past unfitness alone is insufficient; clear and convincing evidence of present unfitness is required. *In re A. J. M.*, 169 Ga. App. 477, 478 (313 SE2d 495) (1984).

Here, based on the facts in the record, we cannot conclude that there is clear and convincing evidence of present unfitness.

(a) The court must first determine that the child is deprived. OCGA § 15-11-94 (b) (4) (A) (i). When the juvenile court awarded temporary custody to DFCS, it found that the children were deprived and entered an order to that effect, which the parents did not appeal. Accordingly, the parents are bound by that finding. *In the Interest of C. J. V.*, 236 Ga. App. 770, 774 (513 SE2d 513) (1999).

(b) The court must next find that a lack of proper parental care or control is the cause of the deprivation. OCGA § 15-11-94 (b) (4) (A) (ii). Clearly that is so here. The children were found in the most

deplorable conditions in August 1998, and there was no one to blame but the parents.

(c) The court must next find that there is a likelihood that the cause of deprivation will continue. OCGA § 15-11-94 (b) (4) (A) (iii). Evidence of past conduct may be considered in determining whether the deprivation is likely to continue if the children are returned to their parents. *In the Interest of C. W. D.*, 232 Ga. App. 200, 204 (1) (501 SE2d 232) (1998). But, again, clear and convincing evidence of present unfitness is required. This is where the evidence falls short of the standard.

The admissible testimony of Riggle showed that for the six months prior to the hearing, the parents had met the goals of the plan except for child support payments. There was no admissible evidence that this was not so. There was no admissible evidence that the parents were so inconsistent in their attempts to comply with the reunification plan that they could not be trusted to do so. The parents hugged their children, had room for them to live, and had lived in the same home for at least a year. The parents had taken care of the primary problem that brought the intervention in the first place; they have apparently learned how to clean and keep the children clean.

The rest of the evidence that reflects negatively on the parents does not amount to clear and convincing evidence that the cause of the original deprivation will continue.

For instance, as part of the justification for the decision to terminate, the trial court found that both parents have a medically verifiable deficiency of their physical, mental, or emotional health of such duration or nature as to render the parent unable to provide for the needs of the children. See OCGA § 15-11-94 (b) (4) (B) (i). Indeed, Dr. Kennedy testified that the father is almost retarded and "clueless" about being a parent. But, the court's finding with regard to the mother is not supported by the record. Dr. Kennedy opined she had a character disorder but that "there is not a flicker of doubt that she could parent these two children even though these are somewhat difficult children." He also said, "I can't see any reason why these two parents can't parent their own children even though these are high-demand children. [The mother] is bright enough and educated enough, and [the father] is compliant enough. That is, if somebody has a switch after him, as at work, he does pretty fair." Accordingly, this finding with regard to the mother has no support in the record and is therefore clearly erroneous. Cf. *In the Interest of A. G. I.*, 246 Ga. App. 85, 87-88 (2) (a) (539 SE2d 584) (2000) (diagnosis without evidence that the disorder renders the parent unable to provide for the needs of the child is insufficient).

Also, although the parents were behind on their support payments, see OCGA § 15-11-94 (b) (4) (C) (ii), delayed compliance with

just one case plan goal is not always sufficient, standing alone, to justify termination. *In the Interest of T. B.*, 242 Ga. App. 564, 569 (6) (b) (529 SE2d 620) (2000). In this case, at the time of the hearing the mother had had a job for six months, which suggests that the parents could make ends meet.

Finally, one caseworker testified that the parents had missed several pediatrician appointments for T., the older sibling. Further, he was behind on his inoculations at one point. This type of evidence can be relevant to how the parents would treat A. A. and C. O. A. See OCGA § 15-11-94 (b) (4) (B) (v).

But, absent the inadmissible summary of Futch's case file, there is simply not sufficient clear and convincing evidence upon which to base a termination order. See, e.g., *In the Interest of K. J.*, 226 Ga. App. 303, 304-306 (1) (486 SE2d 899) (1997). See generally *In the Interest of D. S.*, 217 Ga. App. 29, 30-31 (1) (456 SE2d 715) (1995) (physical precedent only). The guardian ad litem for the children came to the same conclusion. The guardian stated,

> To the contrary, it appears that the parents have substantially complied with the Department's most recent case plans and goals, including that the parents are currently maintaining a sanitary home, have bonded with the children, have cooperated with the agency, and have provided a permanent home for the children. The only exception appears to be being up to date on child support.

"While we are reluctant to reverse the juvenile court's determination, no judicial determination is more drastic than the permanent severing of the parent-child relationship." *In the Interest of K. M.*, 240 Ga. App. 677, 680-681 (523 SE2d 640) (1999).

*Judgments reversed. Blackburn, C. J., and Mikell, J., concur.*

DECIDED OCTOBER 25, 2001.

*Gregory A. Voyles*, for appellant (case no. A01A1422).
*Vernita L. Lee*, for appellant (case no. A01A1423).
*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen S. Nelson, Assistant Attorney General, Charles R. Reddick*, for appellee.