A03A0288. IN THE INTEREST OF V. E. H., a child.

(585 SE2d 154)

ADAMS, Judge.

The mother of V. E. H. appeals the termination of her parental rights.[1] For the reasons that follow, we reverse and remand for further proceedings consistent with this opinion.

V. E. H. was born on August 7, 1996. In November 1999, when V. E. H. was a little over three years old, her mother married Adrian Pinder after having known him for less than two months. In January 2000, Pinder beat V. E. H., inflicting injuries so severe she had to be placed on life support. The Henry County Department of Family and Children Services (DFACS) was awarded emergency custody of V. E. H. pursuant to a 72-hour shelter care order, and the mother stipulated V. E. H. was deprived at the initial hearing. Legal custody of V. E. H. was awarded to DFACS on February 17, 2000, and the mother was not allowed any visitation with the child. On February 20, 2000, DFACS filed its 30 Day Case Plan, recommending that the mother's parental rights be terminated; on February 24, DFACS filed a petition to terminate her parental rights. The mother filed a "Motion for Visitation or Custody, Objection to Biological Parent's Visitation and Motion for 'Gag' Order" on March 10, 2000. A hearing was initially scheduled on the motion for March 16, 2000, but upon request of the biological father, the hearing was continued until March 30, 2000.

A case plan review hearing was scheduled for April 27, 2000, but was continued by request of the mother until May 4, 2000, so that the mother's newly retained attorney could prepare for the hearing. On May 4, 2000, the parties requested that the hearings on the case plan, the mother's motion for visitation, and a contempt motion that had been filed against the mother be consolidated and continued. On May 23, 2000, the matter was again continued due to a scheduling conflict of the mother's attorney. On June 13, the court granted another continuance until June 29, 2000, to allow receipt of doctor's reports and consideration of the mother's request for visitation. More than six months later, on January 25, 2001, the court granted another continuance until February 15, 2001, because the mother's attorney was not present. After another seven months, on August 16, 2001, another continuance was granted until August 30, 2001, because the mother's attorney was out of town and could not appear.

Judicial citizen review panel hearings were held on September 14, 2000, March 27, 2001, and September 25, 2001. In each instance, the panel recommended nonreunification with the mother based on

---

[1] The natural father of V. E. H. voluntarily surrendered his parental rights on April 6, 2001, and is not a party to this appeal.

concerns for the child's safety and the mother's failure to protect the child. Following each hearing, the juvenile court entered supplemental orders incorporating, approving, and adopting the review panels' findings and recommendations. In each of these orders, the juvenile court noted that a copy of the report had been provided to the parties and that none of the parties had requested a hearing or appealed the findings of the panel.

The hearing on the petition to terminate the mother's parental rights was held on December 6 and 7, 2001, and the order terminating the mother's parental rights was entered on February 14, 2002. This appeal followed.

1. The mother first argues that the juvenile court erred by failing to conduct a hearing or enter an order on DFACS' nonreunification case plan as required by subsections (e) and (h) of OCGA § 15-11-58. The juvenile court noted this "procedural deficiency" in the termination order, but found it would not bar granting the petition to terminate the mother's parental rights "in light of the overwhelming evidence supporting the non-reunification plan and the termination of parental rights and in light of the mother's having effectively invited and acquiesced in the oversight by asking for and agreeing in numerous continuances of court proceedings and by never pursuing the hearing."

We agree that the mother's repeated requests for continuances contributed in large part to the error of which she now complains. DFACS submitted its initial case plan in February 2000, and that case plan, as well as all subsequent plans and the reports issued by the citizen review panels, recommended that reunification not be attempted in this case because of the egregious nature of the injuries inflicted on V. E. H. while in her mother's care. As more fully set forth above, the mother agreed to or requested numerous continuances on the hearings scheduled to review the case plans, and she never pursued her right to an appeal following issuance of the reports from the citizen review panels recommending nonreunification. "It is a well-settled appellate rule that one cannot complain of errors or rulings which his own conduct procured or aided in causing." *In the Interest of R. N. R.*, 257 Ga. App. 93, 95-96 (2) (570 SE2d 388) (2002). However, as set forth more fully in Division 2, because reversal in this case is mandated due to the absence of clear and convincing evidence to support the termination of the mother's parental rights, the issue of reunification will need to be revisited upon remand in this case.

2. The mother next argues that there was insufficient evidence to support the termination of her parental rights. We agree and reverse.

Before terminating a parent's rights, a juvenile court must employ a two-step test.

First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) that the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home. On appeal, we view the evidence in the light most favorable to the juvenile court's ruling and determine whether a rational trier of fact could have found by clear and convincing evidence that the parent's rights should have been terminated.

(Footnotes omitted.) *In the Interest of T. B.*, 249 Ga. App. 283, 285-286 (1) (548 SE2d 45) (2001).

The mother consented to the initial determination of deprivation in this case, never appealed that determination, and does not challenge that determination on appeal. *In the Interest of L. J. L.*, 247 Ga. App. 477, 479 (543 SE2d 818) (2001). And we will assume without deciding that the evidence supported the juvenile court's finding that the mother's lack of proper care and control of V. E. H. caused the child to be deprived. However, the evidence falls short on the remaining two findings.

The record and transcript show the following: The mother met Pinder in October 1999 when he spoke at her church about being a reformed alcoholic and drug addict. They married in late November 1999, and Pinder left shortly thereafter to give a speech in Brazil in connection with his ministry work for an organization called Hope for the World. He returned in early December, and on December 11, Pinder, the mother, and V. E. H. traveled to the Bahamas to visit with his family. At this time, Pinder's drug use relapsed, and he began to be "mean" or to speak harshly to V. E. H.; however, he did not hit or spank her. Both the mother and Pinder's parents talked to him about whether he was behaving appropriately with regard to his discipline of V. E. H. The family returned home in early January 2000, and shortly thereafter Pinder began spanking V. E. H., although usually not in the mother's presence because, according to Pinder, the mother did not want him to spank V. E. H. The mother attempted to limit the times when V. E. H. would be alone with Pinder because of her concern about his discipline of the child.

On Thursday, January 20, 2000, Pinder, the mother, and V. E. H.

traveled to North Carolina to visit with the mother's family. After they checked into their hotel, the mother left Pinder and V. E. H. alone in the room while she went to retrieve something from their car, and while she was gone, Pinder spanked V. E. H. with the plastic cover from a coat hanger. The mother knew something had occurred when she returned to the room because of the child's demeanor, and she questioned Pinder, who demonstrated what he had done by again spanking V. E. H. The mother made Pinder leave the hotel room, but allowed him to return the next day after he apologized and promised never to strike or spank V. E. H. again. V. E. H. had noticeable bruises on her the day after this incident, and the mother's brother testified the bruises concerned the mother's family, but that the injuries were not something that required medical attention.

Pinder, the mother, and V. E. H. began the trip back home on Saturday, January 22, 2000. During the drive home, V. E. H. urinated in her pants and Pinder indicated his intent to spank her when they arrived home. Pinder also began drinking during the drive home, although the amount of alcohol he consumed was disputed at the hearing. The mother testified they again argued about his appropriate discipline of V. E. H. Although they continued to argue about his discipline of V. E. H. after they arrived at their apartment, shortly after they arrived Pinder made the mother leave the room while he spanked the child "twice on the butt." The mother immediately observed and questioned V. E. H. after this spanking, and the child was not visibly hurt and indicated to the mother that she was fine. Pinder, the mother, and V. E. H. watched television together, and the mother believed the incident was over and allowed Pinder to put V. E. H. to bed for the night. The mother testified that after V. E. H. was in bed, she went to take a shower.

According to Pinder, he had continued to drink and smoke marijuana and became enraged about his inability to discipline V. E. H. in the way he considered appropriate. He testified that while the mother was still in the shower, he went back into the child's bedroom and beat her with his hands and a wooden spoon, pushed her up against the wall, and then lifted her up by the back of the head and dropped her head on the floor. He then realized he had inflicted serious injury on her and stopped.

The mother testified that when she came out of the shower, V. E. H. was not in her bedroom and so she called out to her, and at that point she realized the child was on the sofa. The mother testified she became concerned because the child looked odd to her; she recalled that it was the child's expression more than any injuries that caught her attention at first. Pinder placed V. E. H. in the bathtub to try and revive her, and when the mother realized that the child was unresponsive, she immediately called 911. The mother testified that

she was hysterical, and the tape from the 911 call reflected the mother's mental state. Although V. E. H. was initially taken to a local hospital, she was almost immediately transported to Egleston Children's Hospital in Atlanta because of the severity of her injuries. The treating physician at Egleston testified that her injuries were massive, and that by the time she arrived at Egleston she was already on life support. The doctor further testified that the injuries, which included a subdural hematoma caused by severe head trauma, were caused by a "substantial number" of separate blows.

Evidence was presented that V. E. H. recovered from her injuries and that as of the date of the hearing she was doing well in school and that no developmental delays had been detected, although the evaluation process was ongoing. Evidence was also presented that Pinder entered a guilty plea to a charge of cruelty to children and was to be deported to the Bahamas following the completion of his jail sentence. Pinder testified that he had no contact with the mother since the plea hearing in August 2000, and evidence was presented that their divorce was final in the fall of that year.[2]

DFACS took the position at the hearing that because there was a nonreunification plan implemented in this case based on the egregious nature of the injuries that occurred while the child was in the mother's care, there had been no investigation of the mother since March 2000 and DFACS did not have any evidence concerning the mother's current circumstances or present unfitness or whether the child would be deprived if she was presently in her mother's custody. However, both the mother and her brother testified about the mother's current circumstances. According to that testimony, the mother was living with her mother, who was an employee of the Human Resources Department of the North Carolina Department of Public Health, in North Carolina. The mother had voluntarily attended parenting classes, had been going to counseling for about one and one-half years, and had attended sixteen to twenty sessions. She testified that this counseling helped her learn to manage stress, to make better decisions, and to accept responsibility for her actions. Although she testified previously that she never anticipated that Pinder would do what he did to V. E. H., she acknowledged that there were actions she could have taken to protect V. E. H.

The mother's brother testified that prior to this incident the family had never had any concerns about the mother's parenting abilities, and that there had been a very close bond between the mother and V. E. H. He testified that he had witnessed the mother interact

---

[2] It is unclear whether the mother entered a plea of nolo contendere or an *Alford* plea to a cruelty to children charge. She was sentenced to probation under the First Offender Act.

with both V. E. H. and her older son, and that she was a good parent and in his opinion would be a good parent again to V. E. H. given the opportunity. He testified that he had never seen the mother strike or hit either of her children and that she used other forms of discipline such as withholding privileges.

As we have reiterated on numerous occasions, " '(e)vidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in her natural child; clear and convincing evidence of *present* unfitness is required.' (Citations and punctuation omitted; emphasis in original.) [Cits.]" *In the Interest of K. M.*, 240 Ga. App. 677, 680 (523 SE2d 640) (1999); *In the Interest of A. A.*, 252 Ga. App. 167, 171 (555 SE2d 827) (2001). In this case, DFACS has failed to show by clear and convincing evidence that the mother is presently unfit and that the deprivation will continue unless her parental rights are terminated. There was no evidence that V. E. H. had been deprived while in her mother's care prior to the mother's marriage to Pinder. At the time of the hearing, Pinder had been removed from the child and the mother's life, and thus the primary cause of the child's deprivation has been remedied. And to the extent the mother's failure to protect V. E. H. resulted in her deprivation, the mother has acted entirely on her own to improve her abilities to care for her child so that a similar situation does not recur.

"Termination of parental rights is a remedy of last resort which can be sustained only when there is clear and convincing evidence that the cause of the deprivation is likely to continue. [Cit.] The evidence is not clear and convincing, at least at this time, that the deprivation is likely to continue." *In the Interest of K. M.*, 240 Ga. App. at 680. See also *In the Interest of D. C. N. K.*, 232 Ga. App. 85, 90 (501 SE2d 268) (1998). " 'While we are reluctant to reverse the juvenile court's determination, no judicial determination is more drastic than the permanent severing of the parent-child relationship.' [Cit.]" *In the Interest of A. A.*, 252 Ga. App. at 173. In light of the evidence presently in the record in this case, the juvenile court's order terminating the mother's parental rights must be reversed and the case remanded for a determination of whether a reunification plan is now appropriate in this case "subject to whatever disposition is warranted by future events and those occurring since the last termination hearing." *In the Interest of K. M.*, 240 Ga. App. at 681; *In the Interest of L. J. L.*, 247 Ga. App. at 481.

*Judgment reversed and case remanded with direction. Andrews, P. J., concurs. Barnes, J., concurs in judgment only.*

DECIDED JULY 8, 2003.

*Kutner & Bloom, Jean M. Kutner, Cook, Lundy & Sanderson, Michelle G. Lundy, Catherine B. Sanderson,* for appellant.

*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen S. Nelson, Brenda A. Raspberry, Assistant Attorneys General, James T. Chafin III,* for appellee.