618 S.E.2d 723 (2005)
274 Ga. App. 791
In the Interest of A.A. et al., children.
No. A05A1063.
Court of Appeals of Georgia.
July 28, 2005.
*724 Malas, Wedean & Malas, Sami O. Malas, Marietta, for appellant.
Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Assistant Attorney General, Richard K. Murray, Dalton, for appellee.
JOHNSON, Presiding Judge.
The mother of A.A., L.A., B.A., G.A., and C.A. appeals from the juvenile court's order terminating her parental rights.[1] She contends that the trial court erred by failing to make specific findings of fact and conclusions of law as to each child, that the evidence was insufficient to authorize the termination of her parental rights, and that the court failed to conduct a termination hearing within one year of the filing of the termination petition. None of the arguments presents any basis for reversal, so we affirm the decision of the juvenile court.
1. The mother claims the evidence presented at the termination hearing was insufficient to authorize a termination of parental rights. We disagree.
In August 2000, the mother asked the Whitfield County Department of Family and Children Services to take custody of her five children because she was homeless and unemployed. Because the Department lacked spaces with bilingual foster parents, it elected to provide support services to the family which would allow the children to remain in the mother's care. During the next few months, the Department and other agencies provided financial assistance to the mother for rent, food and transportation.
Despite the assistance she received, the mother failed to provide necessary health care for the children. For example, the mother neglected to treat the children for head lice, or to obtain treatment for A.A.'s severe dental problems, which included abscesses, infections, and tooth loss, even though social workers and others made arrangements for such care. The mother also failed to seek treatment for C.A.'s bronchitis. When social workers gave the mother a prescription for the condition, the mother failed to administer the medication to the child.
The record shows that the mother failed to properly supervise the children while they were in her care. On one occasion, two-year-old C.A., who has Down's Syndrome, ran in front of a bus while the mother ignored him. On another occasion, the mother sent C.A. and four-year-old G.A. to catch the bus alone while she remained in the apartment. C.A. fell and slid under the bus, and the mother did not come outside. She often left the children outside unsupervised, without shoes, and inappropriately dressed for the weather.
The Department obtained temporary custody of the children on December 22, 2000. The juvenile court entered an order adjudicating the children deprived and awarding custody to the Department. The order was not appealed and the mother is bound by the findings.[2]
The Department developed a reunification and nonreunification plan in January 2001, requiring the mother to establish and maintain housing and income sufficient to meet the family's needs, improve parenting skills, complete parenting classes, cooperate with the Department, visit the children and pay the Department $50 per month in child support, complete a psychological evaluation and follow recommended treatment, and complete an anger management program.
Thereafter, the mother's case plan goals were renewed and reviewed by citizen panels and the juvenile court. On June 26, 2002, the Department filed a petition to terminate *725 the parental rights of the children's mother and their fathers. The termination hearing was delayed over the next two years because of difficulties serving one of the fathers.
At a termination hearing held in October 2004, a psychologist testified that she completed evaluations of the mother in August 2001 and December 2002. She diagnosed the mother as having an adjustment disorder with anxiety. The psychologist related that the mother had homicidal and suicidal ideations in 2001, and that the mother had revealed that if she could no longer see the children, she might kill everyone who had hurt her and then kill herself. In 2002, the psychologist again evaluated her, this time mentioning a 2002 hospitalization due to a "boyfriend problem." The psychologist diagnosed the mother with unspecified adjustment disorder. She noted that the mother still exhibited the potential for homicidal or suicidal behaviors. She reported that the mother was planning to "get even" with the Department, and noted a 2001 suicide attempt.
The psychologist recommended that the mother receive a psychiatric evaluation to assess whether psychotropic medication might be beneficial. She also recommended that the mother obtain regular mental health checkups, noting that if she did not, any children in her care could be at risk.
Another psychologist testified that he performed a parenting skills evaluation of the mother in January and February 2004. He noted that the mother had a difficult time formulating strategies to assess and address the needs of older children. He testified that the mother needed more education and emotional support to help develop her parenting skills. The psychologist noted that she has difficulty forming attachments to people, including the children, and that she has not been able to maintain significant relationships with adults. He added that the children needed stability and that the mother did not have the parenting skills to care for them. He explained that if the children were returned to her home, a caregiver would need to be there 24 hours a day, 7 days a week, to take care of the mother and the children. When asked if he had ever seen anyone with the mother's level of need overcome the problems she possessed and have the children returned to her care, the psychologist replied "Rarely."
The children's case manager from June 2001 to August 2002 testified about the mother's noncompliance with her case plan goals during that period. He testified that the mother never provided any documentation of employment, though she reported being employed about 35-40 percent of the time. She did not have stable housing; at times, she had no power or heat. The case manager added that the mother failed to obtain recommended mental health treatment and did not cooperate with the Department.
A second case manager, who managed the mother's case since August 2002, testified that the mother failed to provide proof that she maintained stable housing for at least six months, that she failed to notify the Department of address and employment changes, and that she failed to provide proof of sufficient income. While she provided proof of employment as of January 2004, she did not provide pay stubs or other proof of income from that job.
The case manager testified further that the mother did not follow through with the recommendations from her psychological evaluations, and paid child support on a sporadic basis and only involuntarily. She added that the mother was in arrears on her support payments. The case manager testified that the mother repeatedly offered to surrender her parental rights to the five children if the Department would help her regain custody of the sixth child. The caseworker testified that the mother did not make any significant progress toward completing the case plans. She noted that one of the children has Down's Syndrome, that that child had made progress with his foster parents, and that his foster parents desired to adopt him. She also testified that while the mother seemed to understand the children's needs in terms of food and shelter, the mother lacked the ability to understand or meet the children's emotional needs.
An agent with the child support enforcement office testified that the mother was to *726 have started paying child support in October 2003, but that no payment was made until February 2004, when she was held in contempt for nonpayment. Payments were eventually made involuntarily through an income deduction order and tax refund intercept. The agent added that as of September 2004, the mother was in arrears in the amount of $1,084.
A third psychologist testified that he evaluated A.A. and L.A. approximately 18 months before the hearing and had counseled them for about a year. He related that permanency was very important for the girls, particularly because of the length of time they had been in foster care. He noted that the girls had formed a "good, healthy attachment" to their foster mother and would be harmed if they were removed from the home.
The foster mother of B.A. and G.A. testified that she had bonded with the girls and wanted to adopt them. The foster mother testified that the mother did not pay attention to the girls during visits, that she did not appear to have bonded with the girls, and that she admitted that she had not bonded with the girls. The foster mother related that the mother repeatedly offered to give the children up for adoption, but that she kept changing her mind, and that she asked the foster mother to care for all of the children.
The foster mother stated that during one of the visits, the mother told her that the girls had told her that they had been raped by a man the mother left them with, but the mother did not believe the girls initially. The mother told her that days later, when she started to believe the girls' story because of their behavior, the evidence was gone.
The foster mother stated that during one visit, the mother showed her and the girls an ultrasound photograph of the seventh child, with whom she was seven months pregnant. Pointing to the child's genitalia in the picture, the mother remarked, "There it is, fresh meat for the guys." When the foster mother expressed disbelief at the mother's comment, the mother repeated it. The mother had also told the foster mother that a California family services department had taken A.A. from her custody years earlier as a newborn because she had bruises all over her body, but that the child was returned to her months later.
A fourth psychologist testified that she counseled B.A. and G.A. She stated that the two needed permanency, which was heightened by the fact that they had attention deficit disorders. Both girls were taking medication to treat the condition as well as depression. The psychologist added that the foster care home was safe, secure, and provided them with the consistency they needed. In her opinion, B.A. and G.A. bonded with their foster family and would be harmed if that bond were broken.
The juvenile court also heard evidence regarding the mother's sixth child. M.T.'s stepgrandmother testified that the mother had shown up for less than ten percent of all scheduled visits with the child and that when she did visit, she did not pay attention to the child. The stepgrandmother testified that the mother told her that she tried to commit suicide twice; once she tried to cut her wrists in front of the witness' son, and another time she took pills. Both attempts were in 2002. She testified that the mother admitted that she was selling the psychiatric drugs prescribed to her on the streets. The mother had expressed a desire to surrender her parental rights to M.T. to the stepgrandmother.
A placement assessor with a family counseling agency testified that he visited the mother's home in September and October 2004, and found that the mother acted inappropriately with the seventh child, M.A. The mother poked the infant to wake her, saying "Wake up; wake up," and put a very loud toy next to her ear. The assessor recommended that the infant not be returned to the mother's custody.
The mother testified that she attempted suicide in 2001 by overdosing on pills and was admitted to a mental hospital the same year. She testified that she attended three appointments with a psychiatrist in 2001, but that she did not obtain recommended psychological counseling. She later testified that she attended 15 appointments in 2001 and *727 another session between August 2003 and January 2004.
While the mother testified that she worked numerous jobs in 2001 through 2003, she admitted that she only provided documentation to the court showing employment for about 16 months in the previous 48 months. She was on maternity leave at the time of the hearing.
The guardian ad litem recommended that the mother's parental rights be terminated. He testified that the mother seemed to care for the children, but that she lacked capacity to take care of the children. He noted the mother's emotional instability, her suicide attempts, her numerous relationships with men, and her inability to maintain adequate stable housing. He further noted that the children were doing well in foster care and that the foster parents desired to adopt some of the children.
To support her position that her rights should not have been terminated, the mother points to evidence that she did visit the children, paid support, had a home, a job and a car, and worked on the case plan from the time the children were removed from her custody until the final hearing.
Nonetheless, as discussed above, there was clear and convincing evidence that despite her efforts, she was incapable of parenting the children, and that termination would be in the best interests of the children.[3] Accordingly, this enumeration presents no grounds for reversal.
2. According to the mother, the trial court erred by referring to the children collectively in its findings of fact and conclusions of law rather than addressing each child separately. To support this contention, the mother cites OCGA § 15-11-94(a). That Code section provides that the trial court is to determine whether there is present clear and convincing evidence of parental misconduct or inability; that if there is, the court shall then consider whether termination of parental rights is in the best interest of the child, after considering the physical, mental, emotional, and moral condition and needs of the child who is the subject of the proceeding, including the need for a secure and stable home.
Nothing in the cited subsection, or in any other provision that we have reviewed, requires separate findings as to each child in a proceeding involving more than one child. In its order, the court made specific findings of fact and conclusions of law pursuant to OCGA § 15-11-94(a). The trial court expressly found pursuant to OCGA § 15-11-94(a) that the children are deprived, that the cause is a lack of proper parental care and control, that the cause of deprivation is not likely to be remedied, and that the continued deprivation will cause serious physical, mental, emotional or moral harm to the children. The court also included specific findings regarding several of the children, noting the special needs of certain children (e.g., one child has Down's Syndrome, another has attention deficit disorder and is in need of regular counseling, and a third child needs regular counseling). And, in its order the court discusses particular facts applicable to all of the children including, among other things, the mother's failure to regularly visit the children, her unstable lifestyle and emotional state, including attempts to kill herself and threats to kill others, her inadequate and unstable housing and employment situations, and her having given birth to two more children (also currently in Department custody) by two more men while the children were in the custody of the Department.
The juvenile court did not err in failing to make separate findings as to each of the five children.
3. The mother contends the trial court erred in failing to conduct a hearing to terminate her rights within one year of the filing of the termination petition. She points out that the hearing was not held until two years after the petition was filed, which she argues is in violation of OCGA § 15-11-93. However, OCGA § 15-11-93 provides that an order terminating parental rights is without limit as to duration and terminates all of the parent's rights regarding the child, and all of the child's rights regarding the parent. Presumably, the mother intended to cite OCGA *728 § 15-11-106, which provides that termination hearings must be conducted in an expedient manner, and that an order of disposition must be issued by the juvenile court no later than one year after the filing of the petition, provided no just cause has been shown for the delay.
This argument fails for two reasons. First, the mother waived the argument by not having made it below.[4]
Second, there was just cause for the delay. The trial court stated in its order that a hearing on the matter was delayed due to difficulties serving notice on one of the fathers. When the case manager attempted to serve him by publication in Texas, she learned that it would cost between $4,000 and $4,500 to do so, and she was unable to get authorization to spend that amount. The Department made many attempts to effect personal service, but was unable to do so. The record contains evidence suggesting that the mother deliberately hindered the Department's efforts to obtain service on the father of two of the children. In a December 2003 order, the court found that she had led a citizen panel to believe that she had the fathers' addresses but that she refused to supply them. At one point, the mother told a caseworker that she would provide the missing address if the Department returned custody of one of her children to her. The father testified that the mother had known his address since 2000. The mother cannot impede service efforts on the father of two of her children and then complain about the delay in holding the hearing.[5] This enumeration is without merit.
Judgment affirmed.
RUFFIN, C.J., and BARNES, J., concur.
NOTES
[1] The mother gave birth to two more children after the five children were temporarily removed from her custody. The younger children are also currently in the custody of the Department of Family and Children Services, though the mother's parental rights as to those children are not at issue in this appeal.
[2] See In the Interest of D.L.S., 271 Ga.App. 311, 313(1)(a), 609 S.E.2d 666 (2005).
[3] See In the Interest of C.D.A., 238 Ga.App. 400, 403-404(1)-(3), 519 S.E.2d 31 (1999).
[4] See generally In the Interest of A.S.O., 243 Ga.App. 1, 4(2), 530 S.E.2d 261 (2000).
[5] See generally In the Interest of V.E.H., 262 Ga.App. 192, 193(1), 585 S.E.2d 154 (2003).