536 S.E.2d 805 (2000)
244 Ga. App. 788
In the Interest of J.H. and M.H., children.
Nos. A00A0452, A00A0458.
Court of Appeals of Georgia.
July 5, 2000.
*806 Dennis C. O'Brien, Marietta, for appellant (case no. A00A0452).
Delia M. Greene, Marietta, Amelia G. Pray, Rhonda M. Breaux, Austell, for appellant (case no. A00A0458).
Thurbert E. Baker, Attorney General, Dennis E. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen A. Sgrosso, Laura W. Hyman, Assistant Attorneys General, Sanders B. Deen, Marietta, for appellees.
PHIPPS, Judge.
Both parents appeal the juvenile court order terminating their parental rights to J.H. and M.H.[1] They assert two grounds for appeal: (1) the juvenile court lacked jurisdiction because the children are Mexican citizens; and (2) the evidence was insufficient to support the termination of their parental rights. Because we find that the juvenile court had jurisdiction and that the evidence was sufficient, we affirm.
The mother is a Mexican citizen illegally residing in the United States. She speaks little English and cannot read or write in English. While living in Georgia, she gave birth to two sons, M.H. on May 19, 1997, and J.H. on June 24, 1998. The biological father of both boys is a citizen of Guatemala and a resident of the United States. In February 1998, the parents were living together in Marietta, Georgia. The mother was employed by Tip Top Poultry, and the father was a construction worker.
While taking M.H. to the doctor for a routine physical, the mother met Alita Gonzalez at the clinic and discovered that Gonzalez lived nearby and provided day care for several children in her home. Although the mother did not inquire into Gonzalez's background or check her references, she began leaving M.H. in her care while she was working. At some point, the mother noticed that Gonzalez was not taking good care of the childrenshe would leave them in the living room unattended while she slept. The mother noticed that the men living with Gonzalez (her husband and three other men) began drinking at the house on Thursday and continued through the weekend. The mother also noticed that after two months, no other children were being left in Gonzalez's care.
On Friday, February 13, 1998, the mother picked up M.H. from Gonzalez's house after work and noticed that his head was swollen and bruised behind both ears. She asked Gonzalez what had happened, but Gonzalez *807 said that she did not know and suggested he had a cold. Despite the fact that over the weekend M.H. cried at night and his condition got worse, on February 16, the mother left M.H. in Gonzalez's care and went to work.
There is conflicting testimony about the events leading up to M.H.'s first hospitalization. The mother testified that on February 17 she went to work for a few hours and then asked Lydia Meijia, who worked in her employer's personnel office, to help her make a doctor's appointment for M.H. Meijia testified that she received a call from Gonzalez that M.H. needed medical attention and went to the assembly line to inform the mother, who responded that she could not leave work or she would lose her bonus. Meijia went to Gonzalez's house and saw M.H. lying on his side, crying, and unable to pay attention or reach for anything. She went back to work and told the mother again that she needed to take M.H. to the doctor. They made an appointment, and the mother took M.H. to the doctor that day. The doctor referred M.H. to the hospital, where he stayed until February 20, 1998.
Although they suspected that Gonzalez had caused M.H.'s prior injuries, on February 23, 1998, the parents again entrusted M.H. to Gonzalez's care and went to work. They told her not to hit their baby again, and Gonzalez promised to take good care of him. But when the mother picked him up that evening, she noticed that M.H. had a new injury on the front of his head. When asked what had happened, Gonzalez again suggested the baby had a cold.
The mother did not take M.H. to the doctor until late on February 24 because she had a previously scheduled appointment at that time. The doctor sent them to Scottish Rite Children's Medical Center for further treatment. Dr. Raahed Ramsey, a radiologist with the medical center, testified that M.H. had suffered three fractures to his skull caused by significant blunt trauma to the head. Based on the nature and severity of M.H.'s injuries, the hospital contacted the Department of Family & Children Services (DFACS). On February 25 or 26, DFACS took custody of M.H.
The parents appeared for a detention hearing before the Cobb County Juvenile Court on February 27. The juvenile court ordered that M.H. remain in protective custody pending further investigation of potential physical abuse.
On March 2, the parents were interviewed by the police about M.H.'s injuries. An officer who was not involved in the investigation provided translation services during the interviews. The parents lied about the cause of M.H.'s injuries. They said that on February 16, M.H. had been sitting in his rocker and had hit his head on the kitchen cabinets. They also told the police that M.H. had fallen off the sofa on February 14. They said that the second injury occurred when M.H. was in his walker and hit his head in the kitchen. They also told the police that the mother did not work and stayed home with M.H. during the day.
In a second interview on April 21, the parents told the police that they had lied and that they believed Gonzalez had caused M.H.'s injuries. They testified at trial that they were afraid to tell the truth at first because of the mother's status as an illegal alien and because they feared retaliation from Gonzalez and the people who lived with her. They testified that they decided to tell the truth during the second interview because they were afraid they would be arrested and put in jail.
The mother was arrested on charges related to M.H.'s injuries and incarcerated. While she was in jail, she gave birth to J.H. DFACS took custody of him only 24 hours after his birth. On June 26, 1998, the Cobb County Juvenile Court conducted a detention hearing. DFACS was awarded temporary custody of J.H. because the mother was incarcerated and the father, who could not be located, was subject to a criminal arrest warrant for child abuse. The court conducted deprivation hearings for M.H. on June 4, 1998, and for J.H. on July 16, 1998, determined that the children were deprived, and continued their temporary placement with DFACS.
At the time of the termination hearing, which began on March 2, 1999, both parents *808 were incarcerated pending disposition of charges related to M.H.'s injuries. After hearing evidence on March 2, April 14, and June 16, 1999, including the translated testimony of the parents, the juvenile court terminated their parental rights on June 22, 1999.
The court ordered DFACS to attempt to locate a relative with whom to place the children. At the placement hearing, it was determined that the parents had no relatives in the United States and that they could not provide addresses for or means to contact relatives in any other country.
1. The parents contend that the juvenile court did not have jurisdiction to terminate their parental rights because the children are Mexican citizens. They argue that because the Supremacy Clause of the United States Constitution reserves matters of immigration and citizenship to the federal government, a state juvenile court lacks jurisdiction to terminate the parental rights of children born to citizens of another country.
We agree that the Cobb County Juvenile Court lacks jurisdiction to determine issues of immigration or citizenship, but those issues were not presented to or decided by the court. It is undisputed that by virtue of their birth in Georgia, M.H. and J.H. are United States citizens. When the termination petition was filed, M.H. and J.H. were citizens of Georgia and thereby entitled to the protection of Georgia law,[2] which specifically provides for the termination of parental rights in certain circumstances.[3]
Juvenile courts in Georgia have exclusive original jurisdiction over proceedings involving the termination of the parent-child relationship.[4] The juvenile court therefore had subject matter jurisdiction to determine if appellants should have their parental rights terminated.
To the extent that the parents also challenge personal jurisdiction or venue, those issues were waived because they were not raised in the trial court.[5]
2. The parents contend that there was not clear and convincing evidence of parental misconduct or inability as is required for the termination of parental rights.
The decision to terminate parental rights is a two-step process. First, pursuant to OCGA § 15-11-81(a), the court determines whether there is clear and convincing evidence of parental misconduct or inability by finding that:
(i) [t]he child is a deprived child, as such term is defined in Code Section 15-11-2; (ii) [t]he lack of proper parental care or control by the parent in question is the cause of the child's status as deprived; (iii) [s]uch cause of deprivation is likely to continue or will not likely be remedied; and (iv) [t]he continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child.[6]
Second, if the court finds clear and convincing evidence of parental misconduct or inability, the court then considers whether termination of parental rights is in the best interest of the child, after considering the physical, mental, emotional, and moral condition and needs of the child, including the need for a secure and stable home.[7]
On appeal from a juvenile court order terminating parental rights, we must review the evidence in the light most favorable to the court's order to determine whether a rational trier of fact could have found clear and convincing evidence that the parental rights had been lost.[8] We do not weigh evidence or determine the credibility of witnesses; rather, we defer to the juvenile court's factfinding and affirm unless the appellate standard is not met.[9]
*809 In June and July 1998, the juvenile court entered orders finding that the children were deprived and that the lack of proper care by the parents caused the deprivation. Because no appeals were taken from those orders, parents are bound by the determinations.[10]
Following the termination trial, the juvenile court issued detailed findings of fact and conclusions of law. Based on the facts set forth above and the court's determination that the father's testimony was not credible, the court concluded that: the parents were the cause of the children's deprivation based on their failure to obtain prompt medical attention for M.H. and their failure to protect him from further injury; the deprivation was likely to continue because the parents' priority was economic survival; and continued deprivation was likely to cause serious physical, mental, emotional, or moral harm to the children. The court also concluded that termination of appellants' parental rights would be in the best interests of the children. Although not set forth in the juvenile court's written order, the judge stated after trial that she was concerned about the uncertainty of the outcome of the criminal charges against the parents and that she could not leave these young children in a similar state of uncertainty as to where they would live.
Viewed in the light most favorable to the juvenile court's order, we find the evidence was sufficient to support the juvenile court's conclusions. The order of termination is therefore affirmed.
Judgment affirmed.
JOHNSON, C.J., and MIKELL, J., concur.
NOTES
[1] Because the facts and issues are the same, we consider the appeals together in this opinion.
[2] Ga. Const. of 1983, Art. I, Sec. I, Par. VII.
[3] OCGA § 15-11-81.
[4] OCGA § 15-11-5(a)(2)(C).
[5] In the Interest of S.K.L., 199 Ga.App. 731, 734(2)(b), 405 S.E.2d 903 (1991).
[6] OCGA § 15-11-81(b)(4)(A).
[7] OCGA § 15-11-81(a).
[8] In the Interest of N.J.W., 233 Ga.App. 130, 503 S.E.2d 366 (1998).
[9] Id.
[10] In the Interest of J.M. D., 221 Ga.App. 556, 558, 472 S.E.2d 123 (1996).