A03A2502, A03A2503. BROGDON et al. v. BROGDON et al.; and vice versa.
(592 SE2d 884)

PHIPPS, Judge.

In 1998, the Berrien County Department of Family and Children Services (DFCS) took a two-month-old boy into emergency custody and later filed petitions in the Juvenile Court of Berrien County alleging that the child was deprived. The child was placed with his paternal grandfather, who along with his stepgrandmother, subsequently petitioned the Berrien County Superior Court for adoption of the child. Proceedings were transferred from juvenile court to superior court. Following a hearing in superior court, the parental rights of the child's natural parents were terminated, and the petition for adoption was granted.

In Case No. A03A2502, the natural parents appeal the order of the superior court terminating their parental rights and granting the adoption. In Case No. A03A2503, the paternal grandparents appeal a subsequent order of the superior court refusing to dismiss the parents' appeal for failure to file the transcript in a timely manner. We affirm the order appealed in Case No. A03A2502 and dismiss the appeal in Case No. A03A2503 as moot.

> The standard of review on appeal from a termination of parental rights is whether, after reviewing the evidence in the light most favorable to the [trial] court's disposition, any rational trier of fact could have found by clear and convincing evidence that the natural parent's right to custody should be terminated. On appeal, this Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the [trial] court's factfinding and affirm unless the appellate standard is not met.[1]

> [T]he considerations for terminating parental rights involve a two-step process. The trial court must first determine whether there is present clear and convincing evidence of parental misconduct or inability. Such conduct or inability may be proved by showing, inter alia, that (1) the child is

---

[1] (Citation and punctuation omitted.) *In the Interest of K. S. W.*, 233 Ga. App. 144, 147 (1) (503 SE2d 376) (1998).

deprived; (2) such deprivation is caused by the lack of proper parental care or control by the parent in question; (3) the deprivation is likely to continue; and (4) the continued deprivation will cause or is likely to cause serious physical, mental, emotional, or moral harm to the child.[2]

A "deprived child" is one who "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health or morals." . . . Deprivation may be shown to have resulted from parental unfitness that is either intentional or unintentional misconduct resulting in the abuse or neglect of a child by what is tantamount to physical or mental incapability to care for the child.[3]

On December 15, 1998, the Berrien County DFCS was notified that a man and his wife had brought their two-month-old son to the hospital with multiple leg fractures. Upon being interviewed by DFCS personnel, the parents' description of how the child broke his leg in several different places was not consistent with the fractures. As a result, DFCS took the child into emergency custody upon his release from the hospital.

About a week later, the Juvenile Court of Berrien County ordered DFCS to place the child in shelter care, and DFCS placed him with the paternal grandfather. A couple of months later, the juvenile court adopted a family reunification case plan submitted by DFCS. The case plan noted that the parents had housing and income, and thus the ability to provide food, shelter, and clothing for the child. The case plan, however, identified a need on the part of the parents to deal with stress, anger, and frustration so as not to place the child at risk of physical harm. To this end, the reunification plan required the parents to obtain counseling, take parenting classes, submit to psychological evaluations, and schedule weekly visits with the child.

The day after the juvenile court adopted the case plan, DFCS filed a deprivation petition. A deprivation hearing was held about five months later, in the summer of 1999. At the hearing, Don McGee, a caseworker with DFCS, testified that although the parents had moved to Lowndes County, they had completed their psychological evaluations and had begun counseling. The father, however, had ceased counseling after two visits and had resumed only several

---

[2] (Citations and punctuation omitted.) *In the Interest of E. C.*, 225 Ga. App. 12, 14 (482 SE2d 522) (1997).

[3] (Citations omitted.) *In the Interest of C. N.*, 231 Ga. App. 639, 640 (1) (500 SE2d 400) (1998).

weeks before the hearing. Moreover, although McGee was told that the parents had completed parenting classes, they had failed to submit supporting documentation. McGee was of the opinion that precautions were still needed to ensure the safety of the child. At the deprivation hearing, the father's former wife testified that she had divorced him because of his violent temper, that his visits with *their* child had been supervised because of concerns for the child's safety, and that the father had quit visiting the child.

Sara Moore, a case manager with the Lowndes County DFCS, referred the mother to a therapist in Lowndes County. The therapist, Patricia Cosey, testified at the hearing that the mother had attended counseling sessions as required and that although she had been cooperative, she had failed to explain the child's injuries and had denied that her husband had a violent temper. At the hearing, the father acknowledged that he had a violent temper and that, as a youth, it had resulted in him being sent to the Sheriff's Boys Ranch, where he had accidentally killed another boy.

About a month after the deprivation hearing, the mother filed a complaint for divorce against the father, alleging that he had a violent temper and that she was in fear for her own and her child's safety. Several days after the complaint was filed, however, she dismissed the action without prejudice.

Considering the testimony introduced at the deprivation hearing, along with the deposition of the doctor who had treated the child at the hospital and the parents' psychological evaluations, the juvenile court entered an order in November 1999 finding by "clear and convincing evidence" that the child was deprived; that the conditions and causes of deprivation were likely to continue and would not be remedied; and that the child was suffering or probably would suffer serious physical, mental, emotional, or moral harm. Accordingly, the court continued DFCS's temporary custody of the child, but ordered continuing reunification efforts with the parents.

After entry of the November 1999 deprivation order, the father dropped out of counseling again and visited the child only sporadically. The mother, however, continued to attend counseling sessions and all scheduled visitations with the child. And the psychological evaluations of the parents were completed.

The evaluations were conducted by Dr. Ann Lucas. By deposition, Lucas testified that the mother had an IQ in the low average range and that, although she did not appear to be clinically depressed or to have any severe organic problems, she had an "adjustment disorder with mixed anxiety and a dependent personality disorder." Lucas described the mother as very impulsive, self-centered, immature, adolescent-like, and insecure. According to Lucas, the mother was overly dependent on other people and would

cover up wrongdoing by a dominant male in her life. Lucas testified that the mother's dependency disorder would require long-term therapy and that it would be characteristic of a woman with such disorder to swear in a divorce petition that her husband was a threat to her family's safety and then recant the allegation. Lucas diagnosed the father with "adjustment disorder unspecified and paranoid personality disorder." According to Lucas, the father had traits associated with sociopathy as well as aggressive and assaultive tendencies.

In the winter of 2000, the juvenile court entered an order determining that plans for reunification with the parents were no longer appropriate or in the best interest of the child. A supplemental order filed at the same time incorporated a case plan wherein the DFCS review of progress showed that the mother had not submitted documentation of her completion of parenting classes, that she had not demonstrated adequate parenting skills during her visit with the child, and that there had been insufficient progress on the case plan to enable return of the child to the parents. DFCS later developed a nonreunification case plan and sought a transfer of temporary custody of the child to the paternal grandfather.

In May 2000, the juvenile court again adjudicated the child deprived. Consequently, temporary custody was awarded to the paternal grandfather, nunc pro tunc to December 1999. The parents were awarded supervised visitation with the child based on a schedule established by the court.

In September 2000, the paternal grandparents instituted proceedings in juvenile court to terminate the parents' rights to the child. In October, the parents filed a complaint in juvenile court seeking modification of that court's prior temporary custody order based on changed circumstances consisting of, among other things, their compliance with the reunification case plan. The parents also filed an application to hold the paternal grandfather in contempt for failure to permit them to visit the child. In response to the parents' complaint for modification, the juvenile court ordered DFCS to conduct a home evaluation of the parents, and a guardian ad litem was appointed for the child.

In December 2000, the paternal grandfather and step-grandmother filed an adoption petition in the Superior Court of Berrien County. About two weeks later, they filed a motion to transfer the juvenile court proceeding to superior court. About a week after that, the juvenile court entered a temporary restraining order against the natural parents, finding that they had failed to comply with the most recent temporary order of the court and restraining them from contacting the paternal grandparents or the child. In January 2001, the juvenile court entered an order transferring the juvenile court proceedings to superior court.

In December 2001, the superior court entered an order determining that the natural parents were bound by the juvenile court's unappealed findings that the child had suffered multiple fractures to his leg while in their custody; that they had been unable to offer any explanation for the fractures; that placement of the child with the paternal grandfather met the child's physical, mental, emotional, and moral needs; that the child was deprived; that the conditions and causes of deprivation were likely to continue; and that because of the deprivation and the likelihood of continued deprivation, the child was suffering or probably would suffer serious physical, mental, emotional, or moral harm. Accordingly, the superior court ruled that the only issue to be decided in the adoption proceeding was whether the adoption was in the best interest of the child.

By agreement of the parties, however, a consolidated hearing on the parents' contempt application and modification complaint and on the grandparents' petition for termination of parental rights was held in superior court in January 2002. At the hearing, the mother acknowledged that although she had attended family and individual counseling sessions with licensed and intern therapists, she had never been treated by a mental health care provider who had knowledge of Dr. Lucas's psychological evaluation. At the hearing, the mother was still unable to explain her child's injuries, even though she acknowledged that they could not have been accidental. The father also continued to deny having harmed the child. Sara Moore, the Lowndes County DFCS case manager, testified that she did not think the parents had been given an adequate opportunity to bond with their child.

In February 2002, the superior court entered an order denying the parents' application for contempt and complaint for modification, granting the grandparents' adoption petition, and terminating the parents' rights to their child. The court found that, as of the date of the final hearing, the parents did not have an explanation for the child's leg injuries; that they had failed to provide a plan for the future protection of the child from injury; that the psychological evaluations showed that the parents had psychological issues that had not been addressed by mental health counselors as ordered by the juvenile court; and that the mother was still living with the father, even after having sworn in a verified complaint that she was in fear of him. Finding no evidence warranting modification of the prior juvenile court orders, the superior court found that the circumstances of injury to the child constituted clear and convincing evidence of parental neglect or abuse; that the parents had failed to exercise proper parental care or control due to their misconduct or inability; that the lack of proper parental care or control was the cause of the child's deprivation; that such cause of deprivation was

likely to continue and would not be remedied; and that the continued deprivation would cause or was likely to cause serious physical, mental, emotional, or moral harm to the child.

1. Where child deprivation proceedings culminate in a petition to terminate parental rights, the parents are bound by determinations made in unappealed deprivation orders.[4] Accordingly, the superior court did not err in ruling in its December 27, 2001 order that the parents were bound by unappealed findings in the juvenile court's deprivation orders.

2. Because no final termination of parental rights hearing had been held in juvenile court, the superior court did err in determining that the only issue to be considered at the hearing in superior court was whether adoption would be in the best interest of the child. Because, however, the hearing on the adoption petition was consolidated with the hearing on the parents' child custody modification complaint, the court did consider fresh evidence on the issues of parental unfitness and child deprivation. Moreover, although evidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in his or her natural child,[5] a court properly considers the past conduct of the parents in determining whether the cause of deprivation is likely to continue.[6] And "those same factors which show the existence of parental misconduct or inability can also support a finding that the termination of parental rights of the defaulting parent would be in the child's best interest."[7] Reviewing the evidence in the light most favorable to the trial court's disposition, we hold that any rational trier of fact could have found by clear and convincing evidence that the natural parents' rights to custody of their child should have been terminated and the adoption granted.[8]

3. The preceding Divisions render Case No. A03A2503 moot.

*Judgment affirmed in Case No. A03A2502. Appeal dismissed as moot in Case No. A03A2503. Blackburn, P. J., and Ellington, J., concur.*

DECIDED JANUARY 8, 2004.

*Smith, Hannan & Parker, Bradley M. Hannan*, for appellants.

---

[4] See, e.g., *In the Interest of J. H.*, 244 Ga. App. 788, 792 (2) (536 SE2d 805) (2000).
[5] *In the Interest of V. E. H.*, 262 Ga. App. 192, 197 (2) (585 SE2d 154) (2003) (physical precedent only).
[6] *In the Interest of C. D. A.*, 238 Ga. App. 400, 403 (1) (519 SE2d 31) (1999).
[7] *In the Interest of G. K. J.*, 187 Ga. App. 443, 444 (2) (370 SE2d 490) (1988).
[8] See *In the Interest of J. V.*, 241 Ga. App. 621 (526 SE2d 386) (1999); compare *In the Interest of V. E. H.*, supra; *In the Interest of K. M.*, 240 Ga. App. 677 (523 SE2d 640) (1999).

■■■■■■■          ■■■■

*Sutton & Associates, Berrien L. Sutton, Christopher S. Badeaux, Bryant H. Bower, Jr.*, for appellees.