A04A0836. IN THE INTEREST OF S. J., a child.
(607 SE2d 225)

PHIPPS, Judge.

The mother of S. J. contests juvenile court orders finding her child deprived and placing S. J. in the custody of the child's paternal

grandmother. Because the evidence was insufficient to support a finding that S. J. was deprived, the contested orders were unauthorized and therefore are reversed.

OCGA § 15-11-2 (8) (A) defines a "deprived child" as one "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health or morals." That definition "focuses upon the needs of the child regardless of parental fault. The [deprivation] petition is brought on behalf of the child and it is the child's welfare and not who is responsible for the conditions which amount to deprivation that is the issue."[1]

> To authorize even a loss of temporary custody by a child's parents, on the basis of deprivation, the deprivation must be shown to have resulted from unfitness on the part of the parent, that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child.[2]

On appeal from a determination that a child is deprived, we review the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the child was deprived.[3] Parental unfitness must also be proved by clear and convincing evidence.[4]

> This standard of review safeguards the high value society places on the integrity of the family unit and helps eliminate the risk that a factfinder might base his determination on a few isolated instances of unusual conduct or idiosyncratic behavior. Only under compelling circumstances found to exist by clear and convincing proof may a court sever the parent-child custodial relationship.[5]

On June 12, 2003, the Cobb County Department of Family and Children Services (DFCS) filed a petition in juvenile court alleging

---

[1] (Citation, punctuation and emphasis omitted.) *In the Interest of J. P.*, 267 Ga. 492 (480 SE2d 8) (1997).

[2] (Citation and punctuation omitted.) *In the Interest of S. S.*, 232 Ga. App. 287, 289 (501 SE2d 618) (1998).

[3] *In the Interest of K. C. H.*, 257 Ga. App. 529, 530 (571 SE2d 515) (2002).

[4] *In the Interest of E. M.*, 264 Ga. App. 277, 278 (590 SE2d 241) (2003).

[5] (Footnote omitted.) Id.

that S. J. was deprived due to the following circumstances:

> This six month old child has been removed from the mother's custody on three separate occasions, once in Washington state, once in Virginia and now in Cobb County. The mother has been charged with assault against the child's father and against the maternal grandmother. During a domestic violence incident in Washington between the mother and the father, the child was dropped, resulting in charges of domestic violence and cruelty to children. Recently, the mother stated that she planned to drown the child and to kill herself. Yet, when the child was removed from her care, she appeared to have no emotion. The mother has moved between Washington, Virginia and Georgia in the last six months.

The following week, S. J.'s mother was appointed counsel.

The juvenile court held a hearing on the petition on July 31, 2003. The mother had been court-ordered to "obtain a psychological evaluation and follow the recommendations of such," and the psychologist who conducted "an initial assessment," Dr. Carl Whitlock, was DFCS's sole witness. He had administered several tests on the mother on June 13, 2003. One test showed that the mother had no "current mental disorder, but . . . was experiencing moderate levels of stress." Another test revealed "no evidence of current personality disorder." A third test indicated that the mother had no anger management problems. The mother told Dr. Whitlock that she had experienced bouts of depression, including suicidal thoughts, primarily related to her miscarriages before her pregnancy with S. J. She had not mentioned harming S. J., but subsequent to his meeting with the mother, DFCS provided to Dr. Whitlock as part of the mother's "background" information that she had threatened to do so. He had factored the alleged threat into his conclusion and recommendation. Dr. Whitlock's conclusion was that the mother's "history . . . indicated to [him] that there has been a history of depression and major depression and that it's been recurrent." Further, Dr. Whitlock concluded, based on the mother's self-reported history of domestic violence with her husband and physical confrontations with her relatives, that the mother might have given false responses on the tests to hide her negative characteristics. Concerning the mother's care of S. J., Dr. Whitlock found "evidence of neglect" based on the several times the mother had left S. J. with someone else. In answering whether S. J. should be returned to her mother, he recommended that a decision regarding that should be based on (1) reports from a psychiatrist who

would consider whether medication was appropriate for the mother, and (2) reports from a treating therapist concerning the mother's current mental status.

The mother testified about her experiences in Washington, Virginia, and Georgia. In March 2002, she was living in Virginia with her husband, who was in the Navy. She had recently been honorably discharged from the Navy, having decided not to re-enlist because of their plan to start a family. In July 2002, her husband was transferred to Washington.

S. J. was born in Virginia in January 2003. The next month, the mother took S. J. to Washington, where they moved into the apartment that her husband was sharing with a roommate. On February 16, a verbal altercation between the couple escalated. The husband hit and shoved the mother, who dropped S. J. The mother and S. J. went to a hospital, where "social workers at CPS" offered them shelter. The mother rejected the offer, believing that a family advocate with the Navy would quarantine her husband to the base and allow her to stay in the apartment. But when she returned to the apartment, she was asked to leave by the family advocate, her husband's roommate, and her husband's supervisor. But she had no place to go. The mother recalled,

> So that's when I called the only person I knew . . . [a] CPS worker that [had come] out and talked . . . at the . . . hospital. . . . I asked her could she take my baby until I made — called my mom, or arrangements for somebody to come get her. . . . They took her for, I think, they had her two days.

S. J.'s maternal grandmother arrived and took the child back to her home in Virginia. S. J.'s mother remained in Washington to resolve some financial matters.

On March 7, the mother moved back to Virginia. She moved in with a friend and immediately began planning to start a new life in the Atlanta area. By April, she had obtained an apartment there and had moved her belongings. The mother's family disagreed with her relocating, and during an argument between her and her mother concerning her relocating, her brother called "CPS." A "CPS" worker arrived, found S. J.'s mother and grandmother upset, and took S. J. with her. S. J. was soon released to her paternal grandmother, who also was living in Virginia. Because that grandmother was not cooperative in allowing S. J.'s mother see the child, S. J.'s mother testified, she went to court, and "[a] judge gave her back to me." S. J.'s stay with her paternal grandmother had lasted 18 days.

The day after S. J. was returned to her mother, April 19, 2003, S. J.'s mother left with S. J. for her apartment in Georgia. During the

first week in Georgia, she worked on setting up insurance, scheduling a doctor's appointment for S. J., and obtaining government assistance. The mother was receiving $400 in monthly child support from S. J.'s father, but because she believed that a Navy regulation required him to pay additional money in spousal benefits, she visited a local military base and daily called her husband's commander for a month. Her husband told her that he would send money directly to a babysitter, but did not follow through. And although she procured two job offers, she was unable to accept either offer because she could not afford day care. Meanwhile, her savings dwindled.

On June 3, 2003, S. J.'s mother telephoned a longtime friend, Yolanda Johnson, about her circumstances, saying that she needed time to complete errands and to obtain, complete, and deliver job applications. Johnson, who was in Virginia, asked her husband, who was working near the mother's apartment, to check on her friend during his lunch break. He arrived at S. J.'s mother's apartment at about 1:00 p.m. that day. The mother testified about what they had planned.

> [Johnson's husband agreed to] keep my baby for three hours for me, because it was around 1:00 o'clock, 1:30, and I told him that I would come and get her at 3:00. I would come and get her at 3:00. I didn't know he was at work. He didn't tell me he was at work. He said he was going home with my baby. And I said, okay, I'll come and get her at 3:00.

Johnson's husband left with S. J. The mother later received a call from him to come to his job. He had taken S. J. to work with him. Someone had called the police to his job. A report was allegedly made to a police officer that the mother had threatened to harm S. J. or herself. The mother arrived and told a police officer and a DFCS worker that she had made no such threats. Responding to further questioning from a DFCS worker, the mother stated that she was feeling "sad, down" and that "I've been through a lot. I just moved here. I don't know too many people. And before I know it, the detective put my baby in the car."

DFCS did not present the testimony of anyone from its department. It presented no police officer from the scene. It did not call Johnson's husband, or anyone from his place of employment, to testify. And according to Johnson, the mother had made no threats to harm either her child or herself.

The mother also testified about her care by a psychiatrist, Dr. T. Brian Kennedy, and by her psychologist, Dr. Carlton Haggard. Dr. Kennedy had prescribed a "mild antidepressant" for her to try for 30

days. She testified, "[a DFCS caseworker] wanted me to get evaluated, see if I needed meds or something." But because she suffered from extreme dizziness during the first week, Dr. Kennedy advised her to discontinue the medication. He prescribed no alternative for her, but offered to do so if she believed that she needed medication. Dr. Kennedy found it unnecessary to continue their sessions when the mother began weekly counseling sessions with Dr. Haggard. Neither Dr. Kennedy nor Dr. Haggard testified at the hearing.

As the mother was describing Dr. Kennedy's treatment, the court interjected that it needed to hear from that doctor. It indicated that it also needed to see evidence of a child care plan, including how it would be funded, and whether some military regulation might afford the mother spousal support or additional child support. The court announced it was "stopping" the hearing "because I know at this point with three referrals and an eight-month-old child and a grandmother being part of one of those referrals that this child's not going home with this mother or this grandmother at this point." The guardian ad litem proposed, "If we can work out an agreement that the child go with the paternal grandmother for the next 10 minutes, would you approve — the mother's shaking her head no. Okay. There you have it." Counsel for the mother clarified that the mother's objection was based on the fact that, when S. J. had previously been in her paternal grandmother's care, that grandmother had not allowed her to visit her child. The mother's counsel suggested that S. J. therefore "go . . . in the care of both grandparents with some stipulations for visitation." The court instructed, "Y'all talk about that," and a recess was taken.

Afterward, the guardian ad litem informed the court, "We have an agreement. We're going to announce it on the record. . . ." After the court tended to related matters, the mother's counsel pressed, "What was the announcement so I make sure I haven't been double-crossed?" Responding to the court's question of whether an agreement had been reached, the guardian ad litem reported,

> I believe the agreement is that the child will be placed in the temporary legal custody of the paternal grandmother and that she would be living with her son, [M. J.], in Washington, and that we'd come back on a — continue this case for 30 days, and that — in the meantime the mother would continue working on her — with her counselor. And hopefully we could have some sort of recommendation by that time and maybe even a report from Dr. Kennedy. I would ask that we just allow them to provide written affidavits or letters instead of having — instead of subpoenaing them, and we can look at those letters together.

Counsel for DFCS stated that the department had no objection to the agreement as announced. The court reiterated that it needed to hear from Dr. Kennedy and see evidence of the mother's child care plan. It further indicated that testimony of a police officer from the June 3, 2003, scene and of Dr. Haggard should be presented. The court continued the matter until "September 4, 9:00 o'clock," recapping,

> So for now [S. J.] is not going to be in the custody of [DFCS], and is going to, by this order that I've just signed, and you'll get a certified copy of it, go into the custody of [the paternal grandmother]. . . . [W]e're going to come back in a month and . . . look at what we need to do.

But at 8:26 a.m. on September 4, 2003, an order was entered (the "deprivation order"). It had been drafted by counsel for DFCS and signed by the juvenile court on August 18, 2003. The order stated,

> [S. J.] is deprived by clear and convincing evidence based on the following circumstances: This child has been removed from her mother's custody on three separate occasions, once in Washington state, once in Virginia and now in Cobb County, Georgia. The mother has been charged with assault against the father of the child; and she has admitted that she assaulted the maternal grandmother. During a domestic violence incident in Washington between the parents, the child was dropped, resulting in domestic violence charges and cruelty to children charges. The mother has moved between Washington State, Virginia and Georgia within the last six months. There are allegations that the mother stated that she planned to harm the child and herself if she was not relieved of the care of the child. She is presently unemployment [sic] and has made no arrangements for childcare when she becomes employed. Dr. Whitaker [sic], a psychologist who evaluated the mother, testified that she has a recurrent history of depression and is presently very stressed.

The order further stated, "[a]fter hearing some evidence, the court requested that the parties mediate the issue of placement of the child based on a stipulation [of] deprivation" and determined "there is clear and convincing evidence that said child are [sic] deprived and the parties being in agreement." The order placed custody of S. J. with her paternal grandmother "pending the review hearing on September 4, 2003."

At the September 4 hearing, the mother's counsel handed the court a letter written by Dr. Kennedy and a letter written by Dr. Haggard. Counsel also reported that the mother had begun working and presented the court with the mother's work schedule and her recent pay stubs. The mother stated to the court her day care plan. DFCS presented no evidence, apparently resting on its counsel's utterance, "We're glad that we've gotten at least the child found to be deprived." The guardian ad litem recommended that the court "maintain the status quo," asserting that "missing links" remained. At the conclusion of the hearing, the court announced that it was placing S. J. in the custody of her paternal grandmother for 24 months.

On October 3, 2003, the mother through counsel filed a "motion for reconsideration of court decision or in the alternative motion to correct/amend/revise order" entered on September 4. Therein, she charged DFCS with not notifying her counsel that DFCS would be submitting a deprivation order to the court. She further argued that the deprivation order misstated and mischaracterized the evidence and relied on hearsay.

On October 7, 2003, the court entered an order (the "custody order"). Without mentioning the mother's pending motion, the order cited the deprivation order entered September 4 and placed custody of S. J. with her paternal grandmother for a period of two years.

Thereafter, on October 22, 2003, the mother's counsel filed a motion to withdraw because the mother no longer wanted her legal services. The court granted that motion on October 23, 2003, and the next day entered an order denying an apparent request by the mother for another court-appointed attorney. By letter dated October 27, 2003, the Cobb County Circuit Defender Office notified the mother, "it has been determined that you are not eligible for a court appointed attorney for the following reason: See [order denying request for another court-appointed attorney]." The referenced order, however, contains no explanation for the denial.

Thus, the mother appeared without counsel at a November 6, 2003 hearing. She repeatedly stated that she did not understand the proceeding. The court told her, "You're here because the attorney that you fired filed a motion for reconsideration, or in the alternative, a motion to correct, amend and revise order." It then announced it would hear argument first from counsel for DFCS and then from the mother.

Counsel for DFCS recounted for the court,

> As you will recall, this hearing was very complex. It was a little disruptive. It was confusing. There was a lot of testimony. And it was so, I think confusing, it seemed to me, that we were asked to break for a while and see if we could

mediate the issue of deprivation. We did. We hammered that out. We worked very hard, I think, for a long period of time, all the parties involved in this case, I think, including the mother and including the various relatives that were here.

We seemed to be getting nowhere for a while, and then [the guardian ad litem], I believe, as the guardian, point-blankly said to the mother, look, if we don't have a stipulation of deprivation, then I — we can't ask the court for a placement on this child. And that was asked — put to her several times and she did finally agree to stipulate to deprivation, and we worked from there to agree to place the child with the paternal grandmother.

The reason that the order was not submitted to counsel for mother was because that was not requested. I don't ordinarily do that. [DFCS] doesn't ordinarily do that. We certainly would have done that if we would have been asked to do that.

As far as the various details of this motion, I think it's — it is details without substance, because the bottom line here is the mother was suffering from mental health problems, whether the children or — appear to be — or suffer from mental health problems. Whether it was two or three times, what — the various details, I think are just details, they're really not relevant to the decision as to whether this child is deprived or not. I think the order that was written is a correct order. And we would ask that it stand as the order of the court.

S. J.'s mother gave a different account.

I did not stipulate to deprivation. . . . I don't know where that came from. We did not discuss that at all. They was asking me where to place my baby. I asked over and over could my baby be placed with my mother. Nobody agreed to that. Nobody was listening to me. They didn't take into consideration that I had been physically abused by my husband. He had been arrested on two occasions where he assaulted me. And the last time, had assault charges against me and my daughter, which she was six weeks at the time.

Later, the mother added, "And I also have a question. Because [DFCS] wrote I was arrested twice and all these other things that was

not true about me, how can that be written about me in a petition, which is not true?"

After hearing from the guardian ad litem, who sided with DFCS, the court announced that it was denying the mother's motion and then stated to the mother, "you have an attorney that's been appointed to appeal this. Are you asking that he proceed with the appeal? Because the time actually runs soon, [Appellate counsel]?" Appellate counsel responded, "It runs tomorrow, arguably. And to be on the safe side, I've come here, in case I needed to . . . file it today." The mother indicated that she wanted to appeal her case. That same day, the mother filed a notice of appeal from the "order filed on October 7, 2003," the custody order.

1. In several claims of error, the mother contends that the finding of deprivation was not supported by the evidence.

(a) DFCS counters that any challenge to the finding of deprivation is untimely, pointing out that the mother filed her notice of appeal more than 30 days after entry of the deprivation order.

This case is properly considered as a deprivation proceeding that further necessitated a determination of child custody. As was the situation in *In the Interest of J. P.*, "both the underlying proceeding and the order complained of . . . address[ed] whether [a] child was deprived."[6] And in that case, the Supreme Court of Georgia explained,

> The juvenile court . . . is the sole court in which to initiate an action concerning any child who is alleged to be deprived. . . . Although the determination of where the child will be placed is necessary to such disposition, the proceeding itself is to determine whether the child is deprived and is not an action brought to decide custody matters.[7]

The Court held that deprivation proceedings do not fall within the scope of OCGA § 5-6-35 (a) (2), which sets forth the types of custody orders that require application for appellate review.[8] Therefore, the Court held, "a right of direct appeal lies from [a final order in a deprivation proceeding]."[9]

---

[6] *In the Interest of J. P.*, 220 Ga. App. 895, 897 (1) (470 SE2d 706) (1996) (physical precedent only), aff'd, 267 Ga. 492 (480 SE2d 8) (1997).

[7] *In the Interest of J. P.*, supra, 267 Ga. 492.

[8] An appeal may be taken only by application from "judgments or orders in divorce, alimony, child custody, and other domestic relations cases including, but not limited to, granting or refusing a divorce or temporary or permanent alimony, awarding or refusing to change child custody, or holding or declining to hold persons in contempt of such alimony or child custody judgment or orders."

[9] *In the Interest of J. P.*, supra, 267 Ga. 492.

An order within a deprivation proceeding deciding temporary custody of the child is a "final order," within the meaning of OCGA § 5-6-34 (a) (1), from which a direct appeal lies.[10] In this case, the order deciding temporary custody of the child was entered October 7, 2003, and the notice of appeal was filed within 30 days thereafter. Therefore, the notice of appeal was timely filed.

(b) DFCS argues that the deprivation finding cannot be challenged in this appeal, which is taken from a custody order. But where, as here, an appeal is taken from a "final judgment" within the meaning of OCGA § 5-6-34 (a) (1), "all judgments, rulings, or orders rendered in the case which are raised on appeal and which may affect the proceedings below shall be reviewed and determined by the appellate court."[11] Accordingly, the deprivation order, expressly relied upon by the juvenile court in deciding the custody issue, is reviewable.[12]

(c) We turn to the merits of this claim of error: whether there was sufficient evidence to authorize a determination that S. J. was deprived. We find that there was not. As the mother claimed in her motion for reconsideration, the deprivation order relied on hearsay and misstated and mischaracterized the evidence.

Although the deprivation order relies on a stipulation that S. J. was deprived, the record contains no stipulation by the mother or her attorney that S. J. was deprived. The mother's assertion that "[they] did not discuss that at all" is corroborated by remarks by the court, the guardian ad litem, and the mother's counsel just before the deprivation hearing recess — all indicating that during the recess, the participants would attempt to reach an agreement *only* about placement for S. J. pending a final deprivation hearing. After that recess, at the persistence of the mother's counsel who was concerned about being "double-crossed," the guardian ad litem for DFCS announced on the record what the parties had agreed to during the recess. Undeniably, that announcement did not touch upon whether S. J. was deprived.

---

[10] See id.; *Sanchez v. Walker County Dept. of Family &c. Svcs.*, 235 Ga. 817 (221 SE2d 589) (1976) (interlocutory appeal procedures are not required for an appeal from a juvenile court order vesting temporary custody of a deprived child with the state); *Dawley v. Butts County Dept. of Family &c. Svcs.*, 148 Ga. App. 815 (1) (253 SE2d 235) (1979) (an order of a juvenile court judge finding certain minors to be deprived children and placing temporary legal custody of them in DFCS is a final order); compare *In the Interest of I. S.*, 265 Ga. App. 759 (595 SE2d 528) (2004), aff'd on other grounds, 278 Ga. 859 (607 SE2d 546) (2005).

[11] OCGA § 5-6-34 (d); see *In the Interest of J. P.*, supra, 267 Ga. 492.

[12] Compare cases holding that unappealed deprivation orders are binding in separate actions to terminate parental rights. E.g., *Brogdon v. Brogdon*, 265 Ga. App. 102, 107 (1) (592 SE2d 884) (2004); *In the Interest of K. W.*, 262 Ga. App. 744, 745 (1) (586 SE2d 423) (2003); see further *In the Interest of C. M.*, 258 Ga. App. 387 (1) (574 SE2d 433) (2002) (deprivation proceedings and parental rights termination proceedings are "separate and distinct").

The deprivation order also relied upon unsubstantiated hearsay: "allegations that the mother stated that she planned to harm the child and herself if she was not relieved of the care of the child." We find no competent evidence of any such threats. The mother denied that she had said that she would harm herself or her child. Likewise, her friend, Johnson, denied ever hearing the mother make such statements. Dr. Whitlock testified that he had factored such threats into his evaluation of the mother, but when asked how he had heard about them, he answered, "I received that information from DFCS." No one from DFCS testified, however. In fact, DFCS now concedes that "the allegation[ ] that [S. J.'s mother] threatened to hurt her baby or herself was not corroborated by direct evidence."

The deprivation order also stated, "Dr. Whitaker [sic], a psychologist who evaluated the mother, testified that she has a recurrent history of depression and is presently very stressed." And on appeal, DFCS cites language from OCGA § 15-11-94 (b) (4) (B) (i) that permits a court, in determining whether a child is deprived, to consider whether the parent exhibited "a medically verifiable deficiency of the parent's physical, mental, or emotional health of such duration or nature as to render the parent unable to provide adequately for the physical, mental, emotional, or moral condition and needs of the child." But DFCS presented no evidence that the mother exhibited any deficiency that rendered her unable to provide for S. J. DFCS's sole witness, Dr. Whitlock, found that the mother had no mental disorder, no personality disorder, and no anger management problems. He recommended that, before any decision was made on the issue of her ability to care for S. J., S. J.'s mother obtain psychiatric care and ongoing therapy. And even assuming that the letter from Dr. Kennedy may be considered competent evidence, he stated therein, "I did not evaluate [the mother's] parenting capacity and I do not perform custody evaluations. . . . I am unable to be of any assistance to you in determining her safety with her daughter."

We turn to other statements in the deprivation order:

> The mother has been charged with assault against the father of the child; and she has admitted that she assaulted the maternal grandmother. During a domestic violence incident in Washington between the parents, the child was dropped, resulting in domestic violence charges and cruelty to children charges.

We agree with the mother that this language, as written by DFCS, misstated or mischaracterized the evidence presented, which on these issues consisted solely of S. J.'s mother's testimony, since the state presented no competent evidence as to these claims. In addition,

DFCS presented nothing concerning the mother's employment at the September 4 hearing, while the mother reported her work schedule, income received, and day care plan.

The remaining circumstances relied upon by the court in its deprivation order are: (1) S. J. "has been removed from her mother's custody on three separate occasions"; and (2) the mother "has moved between Washington State, Virginia and Georgia within the last six months." But DFCS presented no evidence that the circumstances underlying the three occasions demonstrated that S. J. was deprived. On the first occasion, the mother turned to a social worker for urgent temporary aid while she was resolving a housing crisis resulting from her failing marriage. She resolved that matter by immediately arranging for S. J.'s safety in her mother's care out of state; and shortly thereafter, she joined them, leaving her abusive husband behind. The evidence adduced concerning the second occasion showed that it arose when S. J.'s uncle called "CPS" during a family disagreement about S. J.'s mother's quest to begin anew in Georgia. But not only did DFCS fail to call as a witness the uncle, a "CPS" worker, or anyone else from that state, it cites to no evidence in the record showing that the episode caused S. J. to be deprived. Regarding the third occasion, the competent evidence reveals only that the mother secured a few hours of child care from her longtime friend's husband so that she could continue her employment search.

Counsel for DFCS curiously suggested at the hearing on the mother's motion that the circumstances underlying these occasions were "just details, they're really not relevant to the decision as to whether this child is deprived or not." To the contrary, without those details, DFCS failed to clearly and convincingly show that S. J. was deprived. Furthermore, the mother's several relocations during a six-month period does not demonstrate that S. J. was deprived.

The deprivation order relied upon misstatements and mischaracterizations of the evidence and unsubstantiated hearsay. At a minimum, this court must vacate such an order and remand the case for reconsideration.[13] But where, as here, the state has failed to present clear and convincing evidence to prove its allegations of deprivation, remand is unnecessary.[14] Accordingly, the deprivation order is reversed. It follows that, without the alleged basis of deprivation, the mother's loss of custody of S. J. is not authorized. The custody order is also reversed.

---

[13] See *In the Interest of C. D. E.*, 248 Ga. App. 756, 766 (2) (546 SE2d 837) (2001).

[14] See *In the Interest of A. B.*, 263 Ga. App. 697, 701 (2) (589 SE2d 264) (2003) (physical precedent only); *In the Interest of C. D. E.*, supra.

DFCS's petition might have formed a legitimate basis for finding S. J. deprived. And it is possible that the trial court, the parties, and the attorneys involved in this matter knew more about the case than the record before us reflects. But under this record, DFCS utterly failed to meet the evidentiary requirements for establishing deprivation.[15]

(d) Finally, we take this opportunity to address other troubling aspects of the deprivation order. First, the juvenile court inappropriately entered the order "NUNC PRO TUNC the 31st day of July, 2003." "[T]he purpose of a nunc pro tunc entry is to record some previously unrecorded action actually taken or judgment actually rendered. It may not be used to supply an order not yet made by the court."[16] The general rule is that nunc pro tunc entries are proper to correct clerical errors, but not judicial errors.[17] Entry of the deprivation order was not merely recording that which had been decreed, but not recorded; nor was it correctly recording that which had been decreed but misrecorded. As of July 31, 2003, the juvenile court had made no decision regarding whether S. J. was deprived. Rather, during the deprivation hearing that day, it stated that such issue would *not* be decided until after the continuation of the deprivation hearing scheduled for September 4. But before the hearing resumed, as counsel for DFCS plainly admitted, he drafted an order disposing of that issue and then obtained the court's signature — all without first providing to the mother's counsel notice of the proposed order or opportunity to review it.

Second, the way this matter was handled by DFCS's attorney and the juvenile court raises questions about prohibited ex parte communications, and could reasonably result in the appearance of unfairness and denial of due process.[18] In this case, the proposed order contained new "evidence" that was accepted as fact by the juvenile court without affording any opportunity to the opposing side to controvert the merits. "Except as authorized by law or by rule, judges shall neither initiate nor consider ex parte communications by interested parties or their attorneys concerning a pending or impending proceeding."[19]

2. Among her remaining contentions, the mother argues that the juvenile court erred in denying her request for a second appointed

---

[15] See generally *In re R. L. Y.*, 181 Ga. App. 14, 16-17 (351 SE2d 243) (1986).

[16] (Punctuation and footnote omitted.) *In the Interest of H. L. W.*, 244 Ga. App. 498 (535 SE2d 834) (2000).

[17] Id. at 499.

[18] See generally *Cagle v. Davis*, 236 Ga. App. 657, 661-662 (4) (a) (513 SE2d 16) (1999).

[19] Uniform Superior Court Rule 4.1.

counsel, complaining that she was without counsel in pursuing her motion. OCGA § 15-11-6 (b) pertinently provides,

> [A] party is entitled to representation by legal counsel at all stages of any proceedings alleging . . . deprivation and if, as an indigent person, a party is unable to employ counsel, he or she is entitled to have the court provide counsel for him or her. If a party appears without counsel, the court shall ascertain whether such party knows of his or her right to counsel and to be provided with counsel by the court if he or she is an indigent person. The court . . . shall provide counsel for an unrepresented indigent person upon the request of such a person.

The record in this case strongly suggests that the mother was an "indigent person" — particularly in light of the fact that the court advised the mother as she stood confused and unrepresented at the motion hearing that appointed appellate counsel was available. Yet, the record leaves unexplained the juvenile court's denial of the mother's request. Nevertheless, because the deprivation and temporary custody orders are reversed, this contention and all other remaining ones are moot.

*Judgment reversed. Smith, C. J., and Johnson, P. J., concur.*

DECIDED NOVEMBER 23, 2004.

*David P. Smith,* for appellant.

*Thurbert E. Baker, Attorney General, William C. Joy, Shalen S. Nelson, Senior Assistant Attorneys General, Laura W. Hyman, Assistant Attorney General, Edwards, Friedwald & Grayson, Betty R. Blass,* for appellee.

