A05A2249. IN THE INTEREST OF S. L. E. et al., children.

(633 SE2d 454)

PHIPPS, Judge.

The father of S. L. E. and K. R. E. appeals a juvenile court order terminating reunification services, denying his motion for reunification, and extending temporary custody in the children's maternal grandparents. He contests the sufficiency of the evidence. Because the record does not contain clear and convincing evidence to support the termination of reunification services, we reverse that part of the judgment. For reasons that follow, we affirm the denial of the reunification motion and the extension of temporary custody and remand for proceedings not inconsistent with this opinion.

The father obtained legal custody of S. L. E. and K. R. E. pursuant to a divorce decree in August 2000. The girls were ages three and nine months,[1] respectively. In May 2004, the juvenile court adjudicated the children deprived. The court found that the father had physically abused S. L. E., citing severe bruising on the child's buttocks and thighs and a large bald spot on her scalp from her hair having been pulled out of her head. The court placed the children in the custody of the Department of Family and Children Services (DFCS) and ordered DFCS to develop a plan for the father to be reunited with the children.

DFCS placed the children with their maternal grandparents. The reunification plan, which DFCS developed in August 2004, contained the following goals for the father: (a) obtain and maintain safe, stable housing and income appropriate to meet the needs of his family; (b) cooperate with a psychological evaluation and any recommended treatment; (c) attend and complete parenting classes; (d) cooperate with a substance abuse evaluation and any recommended treatment, including random drug screens; (e) cooperate with an anger management inventory and follow any recommended treatment; and (f) cooperate with DFCS, including paying court-ordered child support.[2]

Meanwhile, in September 2004, the father entered a negotiated guilty plea to the charge of cruelty to children by "grabbing [S. L. E.], striking her buttocks and legs with an object, kicking her, and pulling hair from her head." He was sentenced as a first offender to serve five years on probation and ordered to perform 200 hours of community service and attend an anger management course.

In December 2004, the father filed a motion to be reunited with his daughters, asserting he had accomplished each of the goals. In

---

[1] However, the record contains a discrepancy for K. R. E.'s birth year, showing it as 1998 and as 1999.

[2] Pursuant to the deprivation order, a case plan was also developed for the mother.

April 2005, DFCS filed a motion seeking termination of reunification services and an award of permanent custody of the girls to their maternal grandparents. After a hearing, the juvenile court denied the father's motion; terminated reunification services, determining that it was "NOT in the best interest of the children to be reunified with their father"; and extended temporary custody to the maternal grandparents.[3]

1. The father contends that the evidence did not authorize the court to grant DFCS's motion to terminate reunification services.

Pursuant to OCGA § 15-11-58 (h), a court reviewing a determination by DFCS that a reunification plan is not appropriate

> shall determine by clear and convincing evidence whether reasonable efforts to reunify a child with his or her family will be detrimental to the child and that reunification services, therefore, should not be provided or should be terminated. There shall be a presumption that reunification services should not be provided if the court finds by clear and convincing evidence that: (1) The parent has unjustifiably failed to comply with a previously ordered plan designed to reunite the family; (2) A child has been removed from the home on at least two previous occasions and reunification services were made available on those occasions; (3) Any of the grounds for terminating parental rights exist, as set forth in subsection (b) of Code Section 15-11-94;[4] or (4) Any of the circumstances set out in paragraph (4) of subsection (a) of this Code section exist, making it unnecessary to provide reasonable efforts to reunify.[5]

Though we view the evidence in the light most favorable to the juvenile court's judgment, we still must determine whether any rational trier of fact could have found by clear and convincing evidence that reasonable efforts to reunify the children with their father would be detrimental to them and therefore reunification

---

[3] The mother had not accomplished the goals of her case plan.

[4] (Footnote added.) This Code provision defines "parental misconduct or inability" in contemplation of terminating parental rights. See OCGA § 15-11-94 (a).

[5] (Footnote added.) OCGA § 15-11-58 (a) (4) lists: (A) parent has subjected the child to aggravated circumstances including abandonment, torture, chronic abuse, and sexual abuse; (B) parent has committed murder of another child of the parent; been convicted of murder of the child's other parent; committed voluntary manslaughter of another child of the parent; aided or abetted, attempted, conspired, or solicited to commit murder or voluntary manslaughter of another child of the parent; committed a felony assault that resulted in serious bodily injury to the child or another child of the parent; or (C) the parental rights of the parent to a sibling have been terminated involuntarily.

services should be discontinued.[6] We agree with the father that there was not clear and convincing evidence that reasonable efforts to reunify S. L. E. and K. R. E. with him would be detrimental to them and therefore should be terminated.

Evidence showed that the father had substantially met the goals outlined in the reunification plan. He had obtained and maintained safe, stable housing appropriate for the needs of his family. After the girls were taken from his custody, the father moved in with his parents. They were living in a four-to-five bedroom, three bathroom home. He testified that he planned to continue living with them in that home if reunited with his girls. His parents had close relationships with S. L. E. and K. R. E. and had continued to regularly spend time with them.

Evidence showed that the father had been maintaining an income level appropriate to meet the needs of his family. For years, he served as a reservist in the United States Army. At the time of the hearing, his company had been activated and deployed to Iraq; however, he had been assigned to remain in Georgia on bereavement duty and was earning approximately $2,000 monthly. In addition, the father washed windows for businesses and had earned roughly $150 during the month before the hearing. The father also had worked recently as a lift truck operator. About four months after starting that job, he testified, his company was activated, and he was laid off.

Evidence showed that the father had cooperated in submitting to a psychological evaluation and any recommended treatment. The evaluation was conducted by a psychiatrist, who recommended that the father complete parenting and anger management classes and obtain counseling. DFCS told the father to seek counseling from a specific entity, and the father complied. After meeting with the father, that entity recommended no followup.

Evidence showed that the father completed parenting classes, an anger management inventory and followed through with all recommended treatment, and a substance abuse evaluation, which recommended no treatment.

Evidence showed that the father had regularly made child support payments through the court. The father presented receipts of his payments. No set amount of child support had ever been ordered, and counsel for DFCS remarked at the hearing that payment of child support was not "much of an issue."

---

[6] See *In the Interest of S. A.*, 263 Ga. App. 610 (588 SE2d 805) (2003); see generally *In the Interest of S. J.*, 270 Ga. App. 598, 599 (607 SE2d 225) (2004); *In the Interest of B. N. A.*, 248 Ga. App. 406, 407 (1) (546 SE2d 819) (2001).

Moreover, the DFCS caseworker conceded readily that the father had complied with the case plan in all but one regard. She asserted that the father had not been cooperative in obtaining a psychological evaluation and completing any recommended treatment. She claimed that the father had initially submitted to a "psychiatric assessment," instead of an "Axis 1 through 5 psychological evaluation," which is what DFCS had expected. She further pointed out that the person who had conducted the assessment, Dr. Timothy Jennings, was not a psychologist, but a psychiatrist. She testified that Jennings was apparently not familiar with DFCS's procedures. In addition, the caseworker relayed DFCS's concern about the father's representations to Jennings about S. L. E.'s injuries.

The father recounted that DFCS had provided him with no list of preferred or acceptable mental health care providers. So he found one himself in the telephone book. When he met with Jennings in August 2004, he told the doctor that he had been ordered to obtain a psychological evaluation pursuant to a DFCS plan for him to be reunited with his daughters. The father testified, "I told him everything I had done," including that he had spanked one of his daughters by striking her three times with a belt and that this had caused a welt on the child's buttocks. The father also told the doctor that he was being prosecuted for causing bruises on the child, which the father attributed to the child's fall from a bunk bed. The father did not tell Jennings that he had pulled hair from S. L. E.'s scalp, explaining at the hearing that he had no memory of having done so, and, "[I]f I did, I didn't do it on purpose."

At any rate, in January 2005, DFCS reviewed Jennings's report. While it was labeled "PSYCHIATRIC EVALUATION," it did include assessments for Axis I, Axis II, Axis III, Axis IV, and Axis V. The evaluation stated that the father had demonstrated no evidence of any psychiatric illness or any psychiatric condition that would impair his ability to parent his children and that there was no evidence that his children would be in any danger in the father's home with him.

Dissatisfied with this report, the DFCS caseworker advised the father that he had failed to obtain the required "psychological," notwithstanding the report's inclusion of assessments for Axis I through Axis V. At a court hearing later that January, the caseworker represented to the court that a "psychological" would be scheduled for the father. But when March arrived and DFCS had scheduled nothing, the father's attorney contacted DFCS. Next, the father went to the caseworker's office; and while he sat there, the caseworker scheduled a "psychological" with Jennings. The caseworker also sent Jennings certain of DFCS's documentation about the case.

After the second appointment with the father, Jennings wrote to DFCS in March 2005 that the father did not suffer any psychiatric

disorder and that "[t]he Axis diagnosis will remain unchanged in my opinion from my assessment of August 4, 2004." This time, however, the doctor opined that the children were not safe in their father's custody and recommended that the father undergo counseling and complete classes in anger management and parenting.

Accordingly, DFCS sent the father to Family Solutions for counseling and forwarded it a letter informing it only that counseling had been recommended for the father and that DFCS would pay for it. Soon thereafter, the father went to Family Solutions for counseling, after which Family Solutions reported to DFCS that the father needed no counseling.

Dissatisfied with this report, DFCS moved to terminate reunification efforts. The caseworker testified that termination was warranted "[d]ue to the assessment from Dr. Jennings and due to his nonadmission to the allegations of abuse, and that with nonrehabilitation or nonadmittance, that the abuse is likely to occur again, to continue."

But nothing in the record shows that Jennings recommended that the father never be reunited with his children; nor does the record show that Jennings opined that the father could not be rehabilitated. Having reviewed the documentation provided by DFCS, the doctor recommended that the father undergo counseling and complete parenting and anger management classes. The father did complete the recommended classes and further submitted to DFCS's choice of counselors. While the record does not disclose what the father told Family Solutions, DFCS certainly could have taken steps to ensure that Family Solutions had before it all pertinent information about the case prior to counseling him. DFCS did not.

Furthermore, the record in this case does not support DFCS's assertion that the father failed to cooperate in obtaining a psychological evaluation and any recommended treatment. Instead, the record shows that from the month the plan was developed, the father took initiative and maintained persistence to comply with whatever requirements DFCS set. DFCS's witness, the caseworker, failed to provide clear and convincing evidence that reasonable efforts to reunify S. L. E. and K. R. E. with their father would be detrimental to them.[7]

In terminating reunification services, the court found that the father had received no counseling. The court also cited an allegation that in December 2004 the father had thrown a television remote control device at his girlfriend in the children's presence. Further, the court stated that the father's version of how S. L. E. had obtained the

---

[7] See *In the Interest of M. H.*, 251 Ga. App. 528, 531 (554 SE2d 616) (2001).

bruises contradicted its findings in its unappealed deprivation order and the father's guilty plea. And the court remarked that the father's inability to remember pulling out S. L. E.'s hair showed "how completely out of control he was during the incident."

Although the court found that the father had received no counseling, it is uncontradicted that the father had completed parenting classes and an anger management inventory and had followed through will all recommended treatment. It is also uncontradicted that DFCS sent the father to Family Solutions for counseling; that the father presented to that entity for counseling; and that afterward, Family Solutions reported its findings back to DFCS that the father needed no counseling. The father testified that he did not learn until the day of the hearing that DFCS had expected him to undergo additional counseling. In light of the father's record of compliance with the other aspects of the case plan, there is no indication that the father refused to comply with the goal of cooperating with a psychological evaluation and any recommended treatment.

The allegation that the father had thrown a remote control device at his girlfriend was not substantiated by any evidence. The only witness to the incident who testified at the hearing was the father. He said that, after arguing with his girlfriend, "I got up because I was going to go back upstairs. I took the remote and then I tossed it to her. I did not throw the remote. She did not catch it. It hit the base of the wall, the floor and the wall. . . . The back came off because it was just taped on anyway." S. L. E. had been in the room at the time.

While the father's version at the hearing of how S. L. E. obtained the bruises contradicted findings in the unappealed deprivation order, evidence showed that the father nonetheless has taken responsibility for his actions by complying with the resulting terms of the case plan. Moreover, the father entered a negotiated guilty plea, which resulted in the imposition of punishment as a first offender. With respect to that, the father had completed the community service requirement, had remained current on the schedule of payments of fees and fines, and had done nothing to otherwise revoke any of the terms of the first offender treatment.

The question before us is not whether the father is without fault, but whether any rational trier of fact could have found by clear and convincing evidence that reasonable efforts to reunify S. L. E. and K. R. E. with their father would be detrimental to the children.[8] We conclude that it could not, notwithstanding any presumption that

---

[8] See generally *In the Interest of B. N. A.*, supra at 411.

may have arisen to the contrary based upon the underlying incident.[9] While the juvenile court may have correctly assessed the father's lack of control during that incident,[10] the clear and convincing standard "safeguards the high value society places on the integrity of the family unit and helps eliminate the risk that a factfinder might base his determination on a few isolated instances of unusual conduct or idiosyncratic behavior."[11] Because the clear and convincing standard was not met in this case, the grant of DFCS's motion to terminate reunification services was not authorized.[12]

2. Under the evidence, we do not disturb, however, the denial of the father's motion for reunification nor the extension of temporary custody of the children to their maternal grandparents. We remand for a determination of whether a reunification plan is now appropriate, and if so, the establishment of one, subject to whatever events have occurred since the hearing and subject to whatever disposition will be warranted by future events.[13]

*Judgment affirmed in part and reversed in part and case remanded. Andrews, P. J., and Mikell, J., concur.*

DECIDED JUNE 26, 2006.

*Joshua J. Smith*, for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Assistant Attorney General*, for appellee.

[9] See footnote 4, supra, and accompanying text.
[10] The record contains no medical evidence regarding the extent of S. L. E.'s injuries or any pictures depicting the injuries.
[11] *In the Interest of S. J.*, supra.
[12] See OCGA § 15-11-58 (h); *In the Interest of M. H.*, supra at 528-532.
[13] See *In the Interest of K. M.*, 240 Ga. App. 677, 681 (523 SE2d 640) (1999).